[No. 12167–7–I.  Division One.  December 17, 1984.]

GOLF LANDSCAPING, INC., *Respondent,* v. CENTURY CONSTRUCTION COMPANY, *Appellant.*

*Ferguson & Burdell, W. J. Thomas Ferguson,* and *Andrew L. Symons,* for appellant.

*Carney, Stephenson, Badley, Smith & Mueller* and *William C. Hallin,* for respondent.

DURHAM, C.J.—Century Construction Company (Century) appeals from a judgment awarding damages to Golf Landscaping, Inc. (Golf), for unabsorbed overhead and lost profits incurred as a result of Century's breach of a landscaping subcontract with Golf. Century argues that the trial court applied an improper method of calculating unabsorbed overhead, and that the evidence did not support an

award for lost profits.

Century was retained by the Navy as general contractor for the Jackson Park housing project in Bremerton. On April 16, 1976, Century entered into a subcontract for the landscaping work with respondent Golf Landscaping, Inc. The contract required that Golf follow the progress of the job, and provided that work would commence upon 7 days' notice. Golf was to complete the work within 120 days, although the contract did not specify a starting date. Because of delays in preparing the jobsite, Golf was not able to fully commence performance until January 1977. The work was not completed until September 9, 1977, again largely due to delay occasioned by Century's failure to coordinate work among the other subcontractors, and its failure to adequately prepare the jobsite.

On February 13, 1981, Golf brought this action for breach of contract against Century, alleging that Century breached its obligation not to hinder or delay Golf's performance of the landscaping subcontract. Golf alleged several distinct items of damage arising from the delay, including unabsorbed overhead and lost profits.

Following a lengthy trial, the trial court found that Century breached its implied duty not to hinder or delay Golf's performance of the subcontract. In its findings of fact and conclusions of law, the court found that Century was responsible for the 109–day delay experienced by Golf, and that Golf was capable of performing within the original 120–day period set forth in the subcontract. Although the court did not award all of Golf's claimed damages, the court held that Golf incurred unabsorbed overhead expenses of $22,267.68 and lost profits of $18,000. The court purported to calculate Golf's unabsorbed overhead under a formula articulated by the Board of Contract Appeals in *Eichleay Corp.*, 60–2 B.C.A. (CCH) ¶ 2688, *aff'd,* 61–1 B.C.A. (CCH) ¶ 2894 (Armed Servs. 1960). The lost profits award was based upon the court's finding that Golf could have obtained $150,000 worth of other contracts but for the delay.

Century appeals from both the award for unabsorbed overhead and lost profits. In addition, Century argues that the court's finding that it was responsible for the entire delay is not supported by substantial evidence.

Century first contends that the trial court erred by calculating Golf's claim for unabsorbed overhead under the so-called *Eichleay* formula. Century argues that the circumstances of this case do not fit the factual assumptions underlying the *Eichleay* formula. Century also contends that, in any event, Golf failed to prove that it actually incurred additional overhead expenses. These arguments cannot be meaningfully addressed without an understanding of the underlying justifications for recovery of home office overhead expenses occasioned by construction delays.

It is well settled that overhead expenses are a legitimate component of the damages caused by delay in performing a construction contract. *See, e.g., Guy James Constr. Co. v. Trinity Indus., Inc.,* 644 F.2d 525, 532 (5th Cir. 1981); *Luria Bros. v. United States,* 369 F.2d 701, 709–10 (Ct. Cl. 1966). There are, however, two distinct theories for awarding home office overhead as damages for construction delays. The first theory assumes a situation in which a contractor is forced to incur *additional* home office expenses because of delays in performing a particular contract. *See, e.g., Manshul Constr. Corp. v. Dormitory Auth.,* 79 A.D.2d 383, 389, 436 N.Y.S.2d 724, 729 (1981). The second theory is based upon the concept of "unabsorbed" or "underabsorbed" overhead. This concept permits recovery of a contractor's fixed overhead costs that continue throughout the delay period. If the contractor is forced to postpone future projects because of the delay, he or she is left with fewer projects to absorb the overhead expenses that accrue during the delay. If the contractor cannot mitigate damages by reducing overhead, a compensable loss results.[1] *See generally* Note, *Home Office Overhead as*

---

[1]The Board of Contract Appeals has defined "underabsorbed overhead" as "the consequence of the increase in the rate of allocation of indirect costs to work

*Damages for Construction Delays,* 17 Ga. L. Rev. 761, 765–75 (1983).

Golf's overhead claim is of the latter type. Thus, Golf asserts that because of the delay, there were a reduced number of other contracts to which its fixed overhead expenses could be charged.

Golf computed its unabsorbed overhead claim according to a formula derived from the 1960 decision by the Board of Contract Appeals, *Eichleay Corp., supra.* The *Eichleay* formula attempts to allocate to the delayed project a portion of the contractor's total home office expenses incurred during the delayed project's actual period of performance. This allocation is based upon a ratio of the delayed contract's value (measured in actual billings) to the value of all contracts performed during the performance period. This ratio is then applied to the contractor's total overhead during the performance period, yielding the portion of the total overhead allocable to the delayed contract. The allocable overhead is then divided by the number of days required to perform the delayed contract, yielding the daily overhead rate for the delayed project. Finally, the overhead rate is multiplied by the number of delay days to obtain the unabsorbed overhead attributable to the delay.[2]

Century challenges the use of the *Eichleay* formula in this case on two grounds. First, Century argues that the

---

other than that which is delayed or disrupted. It occurs when the allocation base, typically, a grouping of direct costs, is diminished as a result of that delay or disruption. The contract's share of overhead is diminished; the overhead share of all other contract work is increased." *Capital Elec. Co.,* 83–2 B.C.A. (CCH) ¶ 16,548, at 82,311 (Gen. Servs. Admin. 1983), *rev'd on other grounds sub nom. Capital Elec. Co. v. United States,* 729 F.2d 743 (Fed. Cir. 1984).

[2] $$\frac{\text{Delayed Contract Billings}}{\text{Contractor's Total Billings}} \times \text{Total Home Office Overhead}$$
$$= \text{Allocable Home Office Overhead}$$

$$\frac{\text{Allocable Home Office Overhead}}{\text{Days Required to Perform the Delayed Contract}} = \text{Daily Overhead Rate for the Delayed Contract}$$

Daily Overhead Rate x Number of Days of Delay = Overhead Damages
*See Eichleay,* at 13,568.

*Eichleay* formula is based upon the assumption that fixed costs (overhead) accrue unabated during the delay period. Century asserts that the evidence at trial showed that Golf's overhead fluctuated with the volume of its work. In so doing, Century points to testimony in the record indicating (1) that Golf's employees work part time as needed, (2) that the salary of Golf's president, Fred Leenstra, was not continuous during the delay period, and (3) that a large part of the home office expense was for work performed by the Fred Leenstra Company, a separate entity that worked alongside Golf.

Even if Century's factual allegations are correct, they do not necessarily invalidate the trial court's use of the *Eichleay* formula. It is true that a claim for unabsorbed overhead by definition is based upon the alleged continuation of *fixed* expenses through the delay period. *See Robert McMullan & Son, Inc.*, 76–1 B.C.A. (CCH) ¶ 11,728 (Armed Servs. 1976); 17 Ga. L. Rev. at 793–94. However, the distinction between "fixed" and "variable" costs is extremely difficult to draw with precision. *See Salt City Contractors, Ltd.*, 80–2 B.C.A. (CCH) ¶ 14,713 (Veterans Admin. 1980). Accordingly, it is unrealistic to require a plaintiff to completely segregate fixed and variable costs before recovery for unabsorbed overhead is permitted. *See* P. Trueger, *Accounting Guide for Government Contracts* 134 (7th ed. 1982). The Board of Contract Appeals, which has had the most experience applying *Eichleay,* has itself stated that *Eichleay* might not apply when the computation "includ[es] . . . home office expenses which vary *substantially* with the degree of performance of work." (Italics ours.) *Salt City Contractors,* at 72,559.

We recognize that the validity of the *Eichleay* formula has been challenged on a variety of grounds. *See generally* 17 Ga. L. Rev. at 791–809. However, Century's argument here questions *Eichleay*'s accuracy in computing the *amount* of damages, not if Golf's overhead expenses were, in fact, unabsorbed by other contracts. We are persuaded that the *Eichleay* formula affords a reasonable basis for

estimating the amount of unabsorbed home office overhead occasioned by construction delays. *See, e.g., Capital Elec. Co. v. United States,* 729 F.2d 743 (Fed. Cir. 1984); *PDM Plumbing & Heating, Inc. v. Findlen,* 13 Mass. App. Ct. 950, 431 N.E.2d 594 (1982).

Century next argues that the *Eichleay* formula is appropriate only where there has been proof of *additional identifiable overhead costs* resulting from the delay. *Eichleay* has been attacked on precisely this basis. In *Berley Indus., Inc. v. New York,* 45 N.Y.2d 683, 385 N.E.2d 281, 412 N.Y.S.2d 589 (1978), the New York Court of Appeals denied recovery for unabsorbed overhead occasioned by delay because "there was no showing that the delay caused an *increase* in home office activity or expense of any kind." (Italics ours.) *Berley Indus.,* at 687. However, this criticism fundamentally misperceives the theory underlying a claim for unabsorbed overhead. As noted above, such a claim is based upon the *continuation* of fixed costs throughout a delay period, and not upon an increase in overhead. *See* 17 Ga. L. Rev. at 793–94. In a claim for unabsorbed overhead, the relevant inquiry is if the delay prevented the contractor from obtaining contracts during the delay period that would have "absorbed" the ongoing overhead expense. Whether any additional overhead expenses were incurred is irrelevant.

Century next argues that even if use of the *Eichleay* formula was appropriate, it was incorrectly applied. Specifically, Century contends that the trial court incorrectly divided total overhead by the number of days of performance specified in the original contract period, rather than the number of days of actual performance. We agree.

As noted above, the *Eichleay* formula attempts to ascertain a per diem rate of overhead allocable to the delayed project. The formula accomplishes this first by establishing a ratio of billings attributable to the delayed project to total billings during the delay period. By applying this ratio to the total overhead during the performance period, the amount of overhead attributable to the delayed contract is

determined. Century does not quarrel with the trial court's application of this part of the formula.

Because the formula attempts to determine the amount of overhead attributable to the *actual period of performance* of the delayed contract, the per diem rate is necessarily obtained by dividing this figure by the number of days of *actual performance. See Eichleay Corp., supra.* Dividing by the number of days of the original contract period distorts the formula.

Here, the trial court obtained a per diem rate of $209.88. Although the record does not indicate the trial court's own calculations in obtaining this figure, the court apparently accepted the calculations prepared by Golf's accountant. These calculations reflect that the per diem rate was obtained by dividing the overhead attributable to the Jackson Park project by the number of days in the *original contract period* (120). This is clearly an incorrect application of *Eichleay.* Accordingly, the calculations should be adjusted as follows:

$$\frac{\text{Overhead Attributable to Jackson Park (\$25,185)}}{\text{Actual Performance Period (229)}} = \begin{array}{l}\text{Per Diem Rate} \\ \text{of Jackson Park} \\ \text{Overhead (\$109.98)}\end{array}$$

Per Diem Rate ($109.98) x Number of Days of Delay (109)
= Unabsorbed Overhead ($11,987.82)

Golf argues that the trial court's calculations were based upon application of a "modified" *Eichleay* formula ostensibly articulated in *Schindler Haughton Elevator Corp.,* 80–2 B.C.A. (CCH) ¶ 14,671 (Gen. Servs. Admin. 1980). Although it is true that the *Eichleay* formula is not the only accepted method of determining losses for unabsorbed overhead, the trial court purported to apply *Eichleay* in obtaining its damage figure. At no point in the record does it appear that Golf proposed applying anything other than the *Eichleay* formula itself.

Century next argues that there was insufficient evidence to support Golf's claim for lost profits. Again, we

agree.

Lost profits are recoverable when:

(1) they are within the contemplation of the parties at the time the contract was made, (2) they are the proximate result of defendant's breach, and (3) they are proven with reasonable certainty.

*Larsen v. Walton Plywood Co.,* 65 Wn.2d 1, 15, 390 P.2d 677, 396 P.2d 879 (1964). Although the third requirement is concerned with proof of the fact of damage rather than the amount, *Alpine Indus., Inc. v. Gohl,* 30 Wn. App. 750, 754, 637 P.2d 998, 645 P.2d 737 (1981), a claim for lost profits is properly denied "when the alleged loss cannot be proved adequately and remains speculative." *United States ex rel. A.V. DeBlasio Constr., Inc. v. Mountain States Constr. Co.,* 588 F.2d 259, 263 (9th Cir. 1978) (applying Washington law).

Golf's claim for lost profits was based upon its assertion that the delays occasioned by Century prevented it from obtaining other contracts. The only evidence offered by Golf in support of this claim was (1) a list of projects appearing in the Journal of Commerce during the delay period for which it could have submitted bids (exhibit 26) and (2) testimony by Golf's president, Fred Leenstra, that Golf would normally bid on one job per week, and that its success rate was one job for every four bids. This evidence, standing alone, is insufficient to support a claim for lost profits. An identical theory of damages was squarely rejected by the Court of Claims in *Rocky Mt. Constr. Co. v. United States,* 25 Cont. Cas. Fed. (CCH) ¶ 82,755 (Ct. Cl. 1978). There, the court stated:

The lost profits relate not to the particular contract involved, but to other contracts [the contractor] had not yet entered into but which he anticipated receiving. Such consequential damages are not recoverable because they "would not have been reasonably foreseeable by the defendant at the time when the breaches of contract . . . were committed." *It is wholly conjectural whether [the contractor] would have been awarded those additional contracts. The petition states only that he was unable to*

*bid on them and that he had a "reasonable expectation" of receiving them. Such an attenuated theory of damages is legally insufficient.*

(Citations omitted. Italics ours.) 25 Cont. Cas. Fed. (CCH), at 88,354–55.

██ Century next assigns error to a number of findings of fact (findings of fact 8, 9, 10, 12 and 14) that support the court's conclusion that Century was responsible for the delay. In so doing, Century essentially contends that it did not breach the subcontract by preventing Golf from performing within the 120–day limit. The findings are, however, supported by substantial evidence. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 575, 343 P.2d 183 (1959).

The judgment as to Golf's unabsorbed overhead is affirmed but reduced from $22,267.68 to $11,987.82. The judgment as to lost profits is reversed.

CALLOW and SCHOLFIELD, JJ., concur.

Reconsideration denied January 10, 1985.