[No. 40415-0-II.    Division Two.    November 1, 2011.]

SPRADLIN ROCK PRODUCTS, INC., *Respondent*, v. PUBLIC UTILITY
DISTRICT NO. 1 OF GRAYS HARBOR COUNTY, *Appellant.*

642

644

*Catherine Wright Smith* (of *Smith Goodfriend PS*); *Arthur A. Blauvelt III* (of *Ingram Zelasko & Goodwin LLP*); and *Richard A. Pitt* (of *Grays Harbor PUD*), for appellant.

*Jon C. Parker*; and *Kenneth W. Masters* and *Shelby R. Frost Lemmel* (of *Masters Law Group PLLC*), for respondent.

¶1 VAN DEREN, J. — The Grays Harbor County Public Utilities District (PUD) appeals a partial summary judgment order and a subsequent jury award in excess of $4 million in favor of Spradlin Rock Products Inc. The PUD contends that the trial court erred in (1) prohibiting the PUD from challenging rates and charges on Spradlin's invoices at trial, (2) preventing it from presenting evidence contradicting the rates and charges on Spradlin's invoices at trial, (3) giving a jury instruction reiterating the trial court's summary judgment order, (4) denying its motion to dismiss Spradlin's lost profits claim, (5) denying its request

for a special verdict form identifying the jury's award on each of Spradlin's claims, and (6) awarding Spradlin prejudgment interest. Because the trial court properly ordered partial summary judgment and the PUD's other contentions lack merit, we affirm.

## FACTS

### I. BACKGROUND

¶2 Tim and Terese Spradlin own Spradlin Rock Products Inc. (Spradlin),[1] a company that hauls rocks and builds roads in Grays Harbor County. Spradlin has performed work for the PUD since 2000. In December 2006, Spradlin entered into a small works contract[2] with the PUD. The small works contract provided that Spradlin would "furnish labor, material and equipment to provide trenching, backfilling, and excavation, etc. within the district service area, during the years 2007 and 2008, for a total cost not to exceed $200,000.00." Clerk's Papers (CP) at 397 (capitalization omitted). In exchange for these services, the PUD agreed to pay Spradlin $52.90 "weighted cost per hour." CP at 397.

¶3 The small works contract listed four pieces of Spradlin's equipment with set hourly rates that included the equipment operator costs. If a small works project required use of equipment not included in the contract, Spradlin and the PUD agreed to negotiate rates for that equipment. Tim and Supervisor Kirk Anderson were the only Spradlin employees that operated equipment for the small works projects; both were salaried employees, exempt from prevailing wage laws.

---

[1] For clarity, we refer to the company as Spradlin, and we refer to Tim Spradlin by his given name.

[2] A small works contract allowed the PUD to bypass the typical notice and bidding process required under former RCW 54.04.070 (2002) for individual public works projects costing less than $200,000. Former RCW 39.04.155 (2001). The current version of RCW 39.04.155 raised this amount to $300,000 but otherwise remains substantially the same as former RCW 39.04.155.

¶4 On December 2, 2007, a massive windstorm struck Grays Harbor County, leaving 98 percent of its residents without electricity. The PUD requested that Spradlin begin work clearing roads to provide repair crews access to damaged power lines. The parties did not specify Spradlin's compensation, but the PUD orally agreed to cover Spradlin's expenses plus a reasonable profit. Spradlin had already reached its $200,000 limit for small works projects before this December 2007 storm.

¶5 Spradlin immediately began work clearing timber, building access roads, and delivering rock. Because of the scope of the emergency work, Spradlin had to hire additional drivers and equipment operators and lease additional trucks and equipment. After clearing roads in the Grays Harbor area for approximately three days, the PUD asked Spradlin to begin work on the Think of Me Hill and Aberdeen Lake access roads. Spradlin completed work at Aberdeen Lake in late December 2007 and completed work at Think of Me Hill on March 9, 2008.

¶6 On December 10, 2007, the PUD passed Resolution No. 4325, declaring an emergency under RCW 39.04-.280(1)(c), (1)(e), (2)(b)[3] and allowing the PUD to bypass the notice and competitive bidding requirements for public works projects under former RCW 54.04.070.[4] In late January 2008, while Spradlin was still working at Think of

---

[3] RCW 39.04.280(2)(b) provides in part:

If an emergency exists, the person or persons designated by the governing body of the municipality to act in the event of an emergency may declare an emergency situation exists, waive competitive bidding requirements, and award all necessary contracts on behalf of the municipality to address the emergency situation. If a contract is awarded without competitive bidding due to an emergency, a written finding of the existence of an emergency must be made by the governing body or its designee and duly entered of record no later than two weeks following the award of the contract.

[4] Former RCW 54.04.070 (2002) provided in part:

Before awarding [a PUD] contract, the commission shall publish a notice once or more in a newspaper of general circulation in the district at least thirteen days before the last date upon which bids will be received, inviting sealed proposals for the work or materials; plans and specifications of which shall at

Me Hill, the PUD requested that Spradlin also begin work on a project in the Neilton Point area.[5] It appears that the PUD did not submit the Neilton project through the notice and bidding requirements of former RCW 54.04.070 before awarding the project to Spradlin.

¶7 On February 4, 2008, Spradlin submitted its first three invoices, all dated January 31, for storm cleanup performed between December 3 and December 16, 2007 on Powell and Highline Roads, the area around the city of Grays Harbor, and Think of Me Hill. The PUD rejected these Spradlin invoices and, because it was seeking reimbursement from the Federal Emergency Management Agency (FEMA), it requested that Spradlin resubmit the three invoices in a different format. The PUD provided sample invoices from other contractors to aid Spradlin in reformatting its invoices to comply with FEMA requirements and it also requested that Spradlin charge the small works rates for the four pieces of equipment listed in Spradlin's small works contract, which Spradlin agreed to do. The PUD did not raise any other issues with the invoices or with the work Spradlin performed.

¶8 Spradlin adjusted its rates for the four pieces of equipment listed on the small works contract and submitted a more detailed set of three invoices to the PUD. The PUD again rejected the Spradlin invoices for lack of detail and PUD Operations Manager Ed Pauley met with Tim to discuss proper invoice formatting. In mid-February 2008, Spradlin submitted four invoices to the PUD, consolidating the Spradlin work performed from December 3 to December 16 into the first two invoices and adding two more billing invoices for the periods December 17 through December 23 and December 24 through December 30.

---

the time of the publication be on file at the office of the district subject to public inspection.

This provision remains substantially the same in the new version of the statute. *See* LAWS OF 2008, ch. 216, § 2; RCW 54.04.070(3).

[5] The parties also refer to this project as Quinault Ridge.

¶9 In the third submission of a set of four invoices, Spradlin listed each piece of equipment Spradlin used, the number of hours it used each piece of equipment, and the hourly rate Spradlin charged the PUD for the equipment. The third submission of invoices also listed the number of hours each employee worked and the hourly labor rate being charged to the PUD, including regular time, overtime, and double time rates. Additionally, the invoices indicated that Spradlin charged the PUD a "[f]uel [s]urcharge" and a "24/7 [o]perating [e]x[p]enses and [o]verhead" charge. CP at 64-65.

¶10 The PUD approved the third submission of invoices and paid Spradlin on February 27, 2008, February 29, 2008, and March 10, 2008 a total sum of $1,578,051.12. The PUD paid these invoices with the understanding that it could review additional documentation to check for any mistakes in Spradlin's billing, but the PUD did not object to Spradlin's labor rates, equipment rates, fuel surcharge, or operating expenses surcharge listed on the invoices. At Pauley's deposition, Spradlin's trial attorney asked:

Question: All right. So did you approve [Spradlin's January 31, 2008; February 22, 2008; and February 27, 2008 invoices] with the understanding that any *backup material that he had would be provided upon request*?

Answer: Yes, as—because of—my understanding was—I guess his wife does the bookkeeping and he was—I don't know. Yes.

Question: So whatever concern you had about amounts, what did you do about it?

Answer: Again, like I said, without the bills being broken down or itemized with the backup, I figured it is one of those things, *if somebody made a mistake, it could go back and forth.*

Question: *But you didn't question the amount. You didn't tell them this is too much, did you?*

Answer:    *No, because if he supplies the right documentation, it should come out what he says or won't, I mean bottom line.*

CP at 164-65 (emphasis added) (footnotes omitted).

¶11 On March 17, 2008, FEMA denied the PUD's claims for reimbursement. On March 21, Pauley wrote "[d]o not pay" on all Spradlin unpaid invoices. CP at 140. The PUD terminated its contract with Spradlin on April 3, 2008, without paying any remaining outstanding invoices.

II. PROCEDURAL FACTS

¶12 On October 9, 2008, Spradlin filed a breach of contract claim against the PUD in Grays Harbor County Superior Court. Spradlin moved for partial summary judgment, which the trial court granted on February 10, 2010. The summary judgment order stated:

1. Following the December 2, 2007 storm [Spradlin] and [the PUD] entered into a contract under which [Spradlin] was to restore, build, and repair roads so that [the PUD] and its agents could restore electricity to the Grays Harbor County area. [Spradlin]'s crews provided crews seven days a week around the clock for more than 120 days for the [PUD] on various projects relating to storm damage. At the beginning of the work[,] the price terms for the work were left open.

2. It is undisputed that [the PUD] later paid invoices submitted by [Spradlin] for work performed and that the invoices contained a detailed breakdown of the charges for equipment, labor, materials, overhead, fuel surcharges, and sales tax. At no time did the [PUD] complain about or dispute the rates or quality of work done by Spradlin . . . before the termination of the contract.

3. As evidenced by the negotiation, modification, and subsequent payment of invoices[,] a valid contract existed between [Spradlin] and [the PUD] at the prices and rates detailed in the paid written invoices. The charges and rates

contained in the written invoices were in effect during the entire period of [Spradlin]'s performance.

4. [The PUD] has not presented evidence of any genuine issue of material fact regarding course of dealing and/or trade usage. No reasonable fact-finder could determine that the parties intended to rely upon a course of dealing on the small works contracts with regard to the incredible situation that occurred in December 2007.

CP at 329-30.

¶13 The trial court also indicated that its partial summary judgment order prevented the PUD from arguing that Spradlin's billed rates and charges were excessive, but the order did not prevent the PUD from asserting that Spradlin's billed hours were excessive or that Spradlin should not have charged for equipment while the equipment sat idle.

¶14 On February 17, 2010, the first day of trial, the trial court entered an order granting Spradlin's motions in limine. Consistent with the summary judgment order, the order on the motion in limine prevented the PUD from presenting evidence that contradicted the prices and rates included in the paid invoices. The order also prevented the PUD from presenting any evidence that Spradlin wrongfully used equipment belonging to a third party.[6]

¶15 Tim asserted that as a result of the PUD's breach, Spradlin lost profits on a project it would have likely been awarded through a new small works contract. Tim believed that Spradlin would have received the Frye Creek drainage project based on the type of work the project required. Tim stated, "If my [small works] contract would have still been

---

[6] This part of the trial court's order stems from an allegation that Spradlin wrongfully obtained equipment belonging to another contractor while performing work for the PUD. The State has not brought criminal charges related to this incident. On September 19, 2008, the Grays Harbor Superior Court entered a default judgment finding in part that Spradlin used the third party's equipment on an emergency basis with the intent to compensate the owner, and it ordered Spradlin to compensate the owner $25,568.49. The PUD does not challenge this portion of the trial court order granting Spradlin's motions in limine.

in place, th[e Frye Creek] job would have been offered to me to do." Report of Proceedings (RP) (Feb. 19, 2010) at 99. It appears that Spradlin's lost profits claim on the Frye Creek project totaled $15,000.[7]

¶16 The PUD moved to dismiss Spradlin's lost profit claim on the Frye Creek project. The PUD Chief Financial Officer [and] Treasurer Douglas Streeter stated that the Frye Creek project was awarded in 2009 to another company on the PUD's small works roster. He further stated that there was no guarantee that Spradlin would have received the project had it remained on the small works roster.

¶17 The PUD asserted that Spradlin did not have a reasonable expectation of profits because the small works contract allowed the PUD to terminate Spradlin without cause, and the letter terminating Spradlin from the Neilton Point project also terminated its small works contract. The trial court denied the PUD's motion, noting that the PUD's termination letter on the Neilton Point project did not reference the small works contract.

¶18 The PUD unsuccessfully proposed a special verdict form that would have required the jury to show the amount awarded on each of Spradlin's claims.[8] Jury instruction 7 stated:

> The court has already determined that the parties entered into a contract for [Spradlin] to restore, build and repair roads at the prices and rates for labor, equipment, and other charges listed in invoices submitted by [Spradlin] to [the PUD] and paid by [the PUD]. The following facts have been determined by the court and must be accepted by you in deciding this case:

---

[7] The record is not clear about the damages Spradlin claimed on the Frye Creek project. During Tim's testimony, Spradlin's attorney refers to an exhibit not included in the record on appeal that apparently shows the various amounts claimed as part of Spradlin's lost profits. Our opinion assumes the Frye Creek lost profit claim amounts to $15,000, based on closing arguments.

[8] The record does not indicate the trial court's reasons for refusing the special verdict form.

1. Following the December 2, 2007 storm, [Spradlin] and [the PUD] entered into a contract under which [Spradlin] was to restore, build, and repair roads so that [the PUD] and its agents could restore electricity to the Grays Harbor County area. At the beginning of the work[,] the price terms for the work were left open.

2. The . . . PUD later paid invoices submitted by [Spradlin] for work performed and that the four invoices contained a detailed breakdown of prices and rates for equipment, labor, overhead, fuel surcharges, and sales tax.

3. As evidenced by the negotiations, modification, and sub-sequent payment of invoices[,] a contract existed between [Spradlin] and [the PUD] at the prices and rates detailed in the paid written invoices. The prices and rates contained in the written invoices were in effect during the entire period of [Spradlin]'s performance.

4. The court has also ruled as a matter of law that [Spradlin] is entitled to a judgment on Invoice No. 08-103 (Grays Harbor College access), Invoice No. 08-138 and 08-162 (Stockpile Sales) and the retainage on the 2007 Small Works Contract and, therefore, you need not consider these claims in your deliberations.

CP at 536-37.

¶19 The jury returned a general verdict in favor of Spradlin for $4,162,500.00. The trial court awarded Spradlin $659,149.60 prejudgment interest and $25,000.00 in attor-ney fees. The PUD timely appeals.

## ANALYSIS

¶20 The PUD asserts that the trial court erred by granting partial summary judgment prohibiting the PUD from arguing the reasonableness of Spradlin's rates and charges after the PUD paid four Spradlin invoices without raising an issue about either the rates or the charges. The PUD's primary argument at the trial court and in this appeal is that the parties' written small works contract should have controlled the interpretation of the oral con-

tract in which the PUD agreed to cover Spradlin's costs and a reasonable profit for performing emergency services beyond the small works contract. We disagree.

I. PARTIAL SUMMARY JUDGMENT ORDER

A. Standard of Review

¶21 We review a grant of summary judgment de novo. *Beaupre v. Pierce County*, 161 Wn.2d 568, 571, 166 P.3d 712 (2007). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any "genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c).

¶22 The party seeking summary judgment, here Spradlin, bears the burden of establishing its right to judgment as a matter of law, and we must consider the facts and reasonable inferences from the facts in favor of the nonmoving party. *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 518, 826 P.2d 664 (1992). But the nonmoving party may not rely on mere allegations, argumentative assertions, conclusive statements, and speculation to raise issues of material fact precluding a grant of summary judgment. *Greenhalgh v. Dep't of Corr.*, 160 Wn. App. 706, 714, 248 P.3d 150 (2011). Once the moving party meets its burden to show there is no genuine issue of material fact, the nonmoving party must "set forth specific facts rebutting the moving part[y's] contentions and disclose that a genuine issue as to a material fact exists." *Strong v. Terrell*, 147 Wn. App. 376, 384, 195 P.3d 977 (2008), *review denied*, 165 Wn.2d 1051 (2009).

¶23 Contract interpretation is normally a question of fact for the fact-finder. *See, e.g., Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990) (distinguishing contract interpretation, a question of fact, from contract construction, a question of law); *Hansen v. Transworld Wireless TV-Spokane, Inc.*, 111 Wn. App. 361, 376, 44 P.3d 929 (2002)

("Whether there was mutual assent normally is a question of fact for the jury."); *In re Estate of Richardson*, 11 Wn. App. 758, 761, 525 P.2d 816 (1974) ("The existence of a contractual intention is ordinarily a fact question to be resolved by the trier of the facts."). But summary judgment on an issue of contract interpretation is proper where "the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning." *Hall v. Custom Craft Fixtures, Inc.*, 87 Wn. App. 1, 9, 937 P.2d 1143 (1997).

¶24 The interpretation of an oral contract is generally not appropriate for summary judgment because the existence of an oral contract and its terms usually depends on the credibility of witnesses testifying to specific fact-based dealings that, if believed, would establish a contract and the contract's terms. *See, e.g.*, *Duckworth v. Langland*, 95 Wn. App. 1, 6-8, 988 P.2d 967 (1998); *Crown Plaza Corp. v. Synapse Software Sys., Inc.*, 87 Wn. App. 495, 501, 962 P.2d 824 (1997). Here, the parties do not dispute the existence of an oral contract and both agree that the oral contract provided that Spradlin would perform road work in exchange for the PUD's paying Spradlin's costs plus a reasonable profit. Accordingly, the fact that the parties initially entered into an oral contract does not preclude summary judgment. Moreover, the parties performed under the contract, Spradlin did the road work and the PUD paid four invoices without challenging Spradlin's rates or charges detailed on the paid invoices, acts by both parties in reliance on their agreement and an objective manifestation of the substance of their agreement.

B. Course of Performance

¶25 The parties agree that they entered into an oral contract for which Spradlin would be paid its costs and a reasonable profit for performing emergency road work for the PUD. But the PUD now disputes that it agreed to the rates and charges specified on the four Spradlin invoices

that the PUD had reviewed and paid without challenge to either the rates or charges before it refused further payment and terminated Spradlin's work for the PUD. This argument fails for a number of reasons.

■■ ¶26 First, the PUD's conduct in closely reviewing, rejecting, negotiating, and ultimately paying Spradlin's invoices on their third submission manifested its assent to be bound by the clearly displayed rates and charges in Spradlin's invoices; the paid invoices became part of the parties' contract. Further, even if the small works contract were relevant to interpreting the emergency contract's terms, the parties' course of performance under the emergency contract is given greater weight in determining the meaning of the emergency contract than the parties' past course of dealing under the small works contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 203(b) (1981). Moreover, were we to conclude that the small works contract controlled the later oral contract's terms, the result would be unreasonable and/or unlawful. RCW 39.12.020 provides in part:

> The hourly wages to be paid to laborers, workers, or mechanics, upon all public works and under all public building service maintenance contracts of the state or any county, municipality or political subdivision created by its laws, shall be not less than the prevailing rate of wage for an hour's work in the same trade or occupation in the locality within the state where such labor is performed.

¶27 Spradlin had to hire additional nonsalaried equipment operators to complete the emergency work that the PUD requested. In doing so, Spradlin had to pay prevailing wages under RCW 39.12.020. Accordingly, Spradlin could not perform the PUD's requested emergency work in accord with the small works contract while complying with RCW 39.12.020. We agree with the trial court that "[n]o reasonable fact-finder could determine that the parties intended to rely upon a course of dealing [based] on the small works contracts with regard to the incredible situation that occurred in December 2007." CP at 330.

¶28 The PUD also contends that despite having reviewed, rejected, and reviewed twice again Spradlin's invoices, each with additional detail included at the PUD's direction, and then having paid the four itemized invoices, it raised a genuine issue of material fact precluding summary judgment about whether it agreed to Spradlin's specified rates and charges for the emergency work. It argues that because its payment was conditioned on later reviewing documentation supporting Spradlin's charges for mistakes, a genuine issue of fact existed.

¶29 But the PUD's own statements demonstrate that the PUD reserved the right only to check the supporting documentation for mistakes; it did not reserve the right to question the amount Spradlin billed unless there was a mistake found on review of the documentation supporting the paid invoices. Spradlin supplied this documentation to the PUD. This later documentation included certified payrolls, timesheets, rental invoices, and trip tickets. Nothing in the documentation contradicted or indicated a mistake in the earlier submitted and paid rates and charges.

¶30 Further, at no time did the PUD question or contest Spradlin's labor rates, equipment rates, or overhead charges that were clearly indicated on the paid invoices before it terminated its contract with Spradlin. Because the trial court limited its summary judgment ruling to the rates and charges clearly indicated on the paid invoices and the PUD has not raised a genuine issue of material fact about those rates and charges, we hold that summary judgment was proper.[9]

---

[9] The PUD contends that the doctrine of account stated does not preclude it from challenging Spradlin's rates and charges after it reviewed and paid Spradlin's submitted invoices. Because the doctrine of account stated does not apply, we need not address this contention. But, even if we were to consider the PUD's argument, it would fail.

An account stated is " 'a manifestation of assent by debtor and creditor to a stated sum as an accurate computation of an amount due the creditor.' " *Sunnyside Valley Irrigation Dist. v. Roza Irrigation Dist.*, 124 Wn.2d 312, 315, 877 P.2d 1283 (1994) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 282(1)). An express

¶31 The PUD also argues that Think of Me Hill and Neilton Point were separate projects; and, thus, the trial court erred by finding the PUD's payment of invoices for work performed on Think of Me Hill determined the agreed rates and charges for work performed on Neilton Point. The PUD contends that Neilton Point was not an emergency project related to the December 2, 2007 storm. The PUD's contention fails. First, the PUD has failed to produce any evidence that Spradlin performed work on Neilton Point under a different contract. Perhaps more importantly, if Spradlin's work on Neilton Point was not performed pursuant to a contract formed under the PUD's emergency declaration, the PUD's contract with Spradlin would constitute an illegal contract for failure to comply with former RCW 54.04.070's notice and bidding requirements.

¶32 We recognize that construction contracts are generally governed by the common law and not by the Uniform Commercial Code (UCC). *See, e.g., Urban Dev., Inc. v. Evergreen Bldg. Prods., LLC,* 114 Wn. App. 639, 645, 59 P.3d 112 (2002) ("Construction contracts are not governed by the UCC."), *aff'd sub nom., Fortune View Condo. Ass'n v. Fortune Star Dev. Co.,* 151 Wn.2d 534, 90 P.3d 1062 (2004); *Arango Constr. Co. v. Success Roofing, Inc.,* 46 Wn.

---

agreement to settle an account is not required to create an account stated, but "[t]here must be some form of assent to the account, although that assent may be implied from the circumstances and acts of the parties." *Associated Petroleum Prods., Inc. v. Nw. Cascade, Inc.,* 149 Wn. App. 429, 436, 203 P.3d 1077, *review denied,* 166 Wn.2d 1034 (2009). An account stated is "an admission by each party of the facts asserted and a promise by the debtor to pay the sum indicated." *Sunnyside,* 124 Wn.2d at 315. The doctrine of account stated is subject to the rules of mistake and fraud. *Associated Petroleum Prods.,* 149 Wn. App. at 437-38.

In *Associated Petroleum Products,* we held that the doctrine of account stated did not support summary judgment because (1) the case involved a material modification to the terms of the underlying contract and (2) the defendant presented a genuine issue of material fact about its failure to learn of the modification and that this was an excusable unilateral mistake. 149 Wn. App. at 437. *Associated Petroleum Products* does not apply here because the rates and charges on Spradlin's paid invoices did not materially modify the PUD's oral agreement to pay Spradlin its costs plus a reasonable profit and the PUD has not presented any evidence that it was not aware of the clearly displayed rates and charges before paying the invoices.

App. 314, 318, 730 P.2d 720 (1986) ("[C]onstruction contracts are not governed by RCW 62A.2.").

¶33 Although UCC article 2 (ch. 62A.2 RCW) does not control the contract at issue here, our Supreme Court supplied us with guidance in this situation when it applied the UCC by analogy to a service contract with similar facts, having based its decision on UCC contract interpretation of a UCC-covered agreement. *Puget Sound Fin., LLC v. Unisearch Inc.*, 146 Wn.2d 428, 431, 47 P.3d 940 (2002). And under the UCC, article 2, a party's course of performance may be relevant in interpreting the meaning of an agreement.[10]

¶34 Puget Sound Financial entered into an oral service contract with Unisearch to perform a filing search. *Puget Sound Fin.*, 146 Wn.2d at 431. Unisearch complied and then sent an invoice for $25, which also included a liability limitation statement. *Puget Sound Fin.*, 146 Wn.2d at 431. Puget Sound Financial later sued Unisearch, alleging negligence and breach of contract and requesting damages in excess of $25. *Puget Sound Fin.*, 146 Wn.2d at 432. Our Supreme Court ultimately held that the liability limitation, presented in a regular invoice for the purchase of commercial services, became part of the contract and was enforceable. *Puget Sound Fin.*, 146 Wn.2d at 438. In so holding, the court recognized that the contracting parties' course of

---

[10] RCW 62A.2-208 provides:

(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (RCW 62A.1-205).

(3) Subject to the provisions of the next section on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance.

dealing was relevant to determining the contract's terms. *Puget Sound Fin.*, 146 Wn.2d at 438.

¶35 In reaching its conclusion that Puget Sound Financial agreed to be bound by the liability limitation provisions contained in Unisearch's invoice by paying prior invoices without objection, our Supreme Court relied on a case involving a goods contract the UCC did govern. *Puget Sound Fin.*, 146 Wn.2d at 437-38 (citing *M.A. Mortenson Co. v. Timberline Software Corp.*, 140 Wn.2d 568, 998 P.2d 305 (2000)). *Mortenson* addressed the validity of liability limitations in " 'shrinkwrap license[s]' " that accompany computer software. 140 Wn.2d at 571. Mortenson purchased licensed software from Timberline. *Mortenson*, 140 Wn.2d at 571. The software packaging included a license agreement with a liability limitation clause. *Mortenson*, 140 Wn.2d at 574-75. When Mortenson encountered a problem with the software, Timberline invoked the limitation clause. *Mortenson*, 140 Wn.2d at 576-77.

¶36 Mortenson argued that the contract consisted only of the purchase order and that it never saw or agreed to the provisions in the licensing agreement. *Mortenson*, 140 Wn.2d at 577. Our Supreme Court disagreed and held that the terms of the license were part of the contract and that Mortenson's use of the product constituted assent to the liability limitation clause. *Mortenson*, 140 Wn.2d at 584. "We conclude because RCW 62A.2-204 allows a contract to be formed 'in any manner sufficient to show agreement . . . even though the moment of its making is undetermined,' it allows the formation of 'layered contracts.' " *Mortenson*, 140 Wn.2d at 584 (alteration in original).

¶37 Both *Puget Sound Financial* and *Mortenson* employed the parties' course of dealing to support the inclusion of supplemental terms in a layered contract.[11]

---

[11] Our Supreme Court's use of course of dealing in *Mortenson* stems from the UCC definition of an "agreement," which would not apply to the construction contract at issue here. 140 Wn.2d at 584-85. But, as in *Puget Sound Financial*, we may apply the reasoning of *Mortenson* by analogy.

"[C]ourse of dealing [is] relevant to interpreting a contract and determining the contract's terms." *Puget Sound Fin.*, 146 Wn.2d at 434. A "course of dealing" refers to dealings between the same parties in other transactions or contracts that establish a common basis of understanding for interpreting the disputed transaction or contract. *Morgan v. Stokely-Van Camp, Inc.*, 34 Wn. App. 801, 809, 663 P.2d 1384 (1983) (citing RCW 62A.1-205(1)).

¶38 In contrast, a "course of performance" refers to "[a] sequence of previous performance by either party after an agreement has been entered into, when a contract involves repeated occasions for performance." BLACK'S LAW DICTIONARY 405 (9th ed. 2009); *see also* RCW 62A.2-208, UCC § 1-303 (2004). Although it appears no Washington case has squarely addressed whether a course of performance analysis is proper in the context of interpreting a common-law governed contract, applying the reasoning of *Puget Sound Financial* and *Mortenson* by analogy, we hold that the PUD's course of performance in paying Spradlin's invoices showed its agreement to be bound by the rates and charges contained in those invoices, thus undermining any later claim that a material issue of fact exists about whether the PUD agreed to them. This is consistent with RCW 62A.2-208(1) that addresses "repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other," and notes that "any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." Accordingly, the four invoices the PUD paid without objection became part of the contract between the PUD and Spradlin and clarified the meaning of the parties' oral agreement that the PUD would pay Spradlin its costs plus a reasonable profit.

¶39 We hold that no material issue of fact precluded the trial court's ruling that the PUD could not challenge Spradlin's rates or charges on the four paid invoices because those rates and charges were a part of the agreement

between Spradlin and the PUD for the emergency work Spradlin performed.

## II. MOTIONS IN LIMINE

¶40 The PUD also asserts that the trial court erred by granting Spradlin's motions in limine that prevented the PUD from presenting evidence contradicting the rates and charges on the paid invoices, consistent with the trial court's summary judgment order. The PUD bases this argument on the premise that the trial court erred in granting partial summary judgment. Because we hold that the trial court properly found that the PUD had agreed to the rates and charges contained on the paid invoices, evidence contradicting this finding was properly excluded as being irrelevant. ER 402.

## III. JURY INSTRUCTION 7

¶41 The PUD also assigns error to the trial court's decision to submit jury instruction 7, which informed the jury that "the parties entered into a contract for [Spradlin] to restore, build and repair roads at the prices and rates for labor, equipment, and other charges listed in invoices submitted by [Spradlin] to [the PUD] and paid by [the PUD]." CP at 536. Because we hold that the trial court properly found that the PUD had agreed to the rates and charges contained on the paid invoices, we discern no error in jury instruction 7.

## IV. LOST PROFITS CLAIM[12]

¶42 The PUD also asserts the trial court erred by failing to dismiss Spradlin's lost profits claim related to the Frye Creek project, which Spradlin had expected to receive

---

[12] Spradlin asserts that the PUD waived its lost profits argument at the trial court because it argued for dismissal on different grounds. The PUD's argument at the trial court that the trial court should dismiss Spradlin's lost profits claim because there was no guarantee of work is sufficiently similar to its argument on appeal that Spradlin's lost profits claim was too speculative as a matter of law; therefore, we review the PUD's contention on the merits.

under a renewed small works contract with the PUD. Specifically, the PUD contends that Spradlin's lost profits claim was too speculative as a matter of law because "there was no guarantee that had Spradlin remained an eligible contractor it would have received the Frye Creek project," citing *Golf Landscaping Inc. v. Century Construction Co.*, 39 Wn. App. 895, 696 P.2d 590 (1984). Br. of Appellant at 39. We hold that Spradlin presented sufficient evidence of lost profits to survive a motion to dismiss.

¶43 A plaintiff may recover lost profits if the evidence establishes lost profits with reasonable certainty. *Eagle Grp., Inc. v. Pullen*, 114 Wn. App. 409, 418, 58 P.3d 292 (2002). " 'Evidence of damage is sufficient if it is the best evidence available and affords a reasonable basis for estimating the loss.' " *Kwik-Lok Corp. v. Pulse*, 41 Wn. App. 142, 150, 702 P.2d 1226 (1985) (quoting *Barnard v. Compugraphic Corp.*, 35 Wn. App. 414, 418, 667 P.2d 117 (1983)). Competent evidence of damages does not subject the trier of fact to speculation or conjecture. *ESCA Corp. v. KPMG Peat Marwick*, 86 Wn. App. 628, 639, 939 P.2d 1228 (1997), *aff'd*, 135 Wn.2d 820, 959 P.2d 651 (1998).

¶44 In *Golf Landscaping*, the trial court awarded the plaintiff contractor lost profits due to the defendant subcontractor's delays in performance. 39 Wn. App. at 896. Golf Landscaping's lost profit claim was based entirely on (1) a list of projects appearing in a journal that it could have bid on during the delay caused by Century and (2) testimony that it would normally bid on one job per week with a 25 percent success rate. *Golf Landscaping*, 39 Wn. App. at 903. Division One of this court reversed the lost profits award, holding that the evidence was too attenuated to support a lost profits claim:

"Such consequential damages are not recoverable because they would not have been reasonably foreseeable by the defendant at the time when the breaches of contract . . . were committed. *It is wholly conjectural whether [the contractor] would have been awarded those additional contracts. The petition states*

*only that [plaintiff contractor] was unable to bid on them and that he had a "reasonable expectation" of receiving them. Such an attenuated theory of damages is legally insufficient."*

*Golf Landscaping*, 39 Wn. App. at 903-04 (first and second alterations and emphasis in original) (citations omitted in original) (internal quotation marks omitted) (quoting *Rocky Mountain Constr. Co. v. United States*, 218 Ct. Cl. 665, 666, 25 Cont. Cas. Fed. (CCH) ¶ 82,755 (1978)).

¶45 Here, however, Spradlin's theory of damages was not so attenuated. Unlike Golf Landscaping, Spradlin's claim for lost profits was based on a specific project that it would have been eligible for had it remained on the small works roster. Further, unlike in *Golf Landscaping*, where the contractor based its lost profits claim on potential projects listed in a trade magazine, Spradlin's continuous business relationship with the PUD since 2000 gave it a reasonable basis to believe it would have received the Frye Creek project. Contrary to the PUD's contention, Spradlin was not required to establish with absolute certainty that but for the PUD's breach of their contract, it would have been awarded the Frye Creek project. *Riverview Floral, Ltd. v. Watkins*, 51 Wn. App. 658, 663, 754 P.2d 1055, 764 P.2d 1012 (1988). Washington courts abide by the principle that " 'the wrongdoer shall bear the risk of the uncertainty which [its] own wrong has created.' " *Jacqueline's Wash., Inc. v. Mercantile Stores Co.*, 80 Wn.2d 784, 790, 498 P.2d 870 (1972) (internal quotation marks omitted) (quoting *Wenzler & Ward Plumbing & Heating Co. v. Sellen*, 53 Wn.2d 96, 99, 330 P.2d 1068 (1958)). Spradlin presented sufficient evidence of lost profits to survive a motion to dismiss.

V. Prejudgment Interest Award

¶46 Next, the PUD asserts that the trial court erred by awarding Spradlin $659,149.60 in prejudgment interest. Specifically, the PUD contends that an award of prejudgment interest was improper because the jury's $4,162,500.00

general verdict included both liquidated and unliquidated damages. We disagree.

¶47 We review a trial court's order on prejudgment interest for an abuse of discretion. *Scoccolo Constr., Inc. v. City of Renton*, 158 Wn.2d 506, 519, 145 P.3d 371 (2006). A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds or reasons. *Olver v. Fowler*, 161 Wn.2d 655, 663, 168 P.3d 348 (2007).

¶48 A trial court may award prejudgment interest if the amount claimed is liquidated. *Safeco Ins. Co. v. Woodley*, 150 Wn.2d 765, 773, 82 P.3d 660 (2004). A claim is liquidated "where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968). A claim is unliquidated "where the exact amount of the sum to be allowed cannot be definitely fixed from the facts proved, disputed or undisputed, but must in the last analysis depend upon the opinion or discretion of the judge or jury as to whether a larger or a smaller amount should be allowed." *Prier*, 74 Wn.2d at 33 (emphasis omitted) (quoting CHARLES T. MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 54 (1935)). It is the character of the original claim, rather than the court's ultimate method for awarding damages, that determines whether prejudgment interest is allowable. *Prier*, 74 Wn.2d at 33.

¶49 That a claim is disputed does not make it unliquidated. *N. Pac. Plywood, Inc. v. Access Rd. Builders, Inc.*, 29 Wn. App. 228, 235, 628 P.2d 482 (1981). "Prejudgment interest is favored in the law based on the premise that he who retains money he should pay to another should be charged interest on it." *Universal/Land Constr. Co. v. City of Spokane*, 49 Wn. App. 634, 641, 745 P.2d 53 (1987).

¶50 Here the trial court awarded prejudgment interest on $3,295,748 of the $4,162,500 jury verdict based on the PUD stipulating during closing that it owed that sum to Spradlin on the outstanding, unpaid invoices. The PUD

asserts that the trial court erred because a stipulation about a specific damage amount does not render an otherwise unliquidated amount liquidated. While it is true that "[t]he fact that the parties stipulated to a portion of the amount owing does not by itself render that amount liquidated," if the amount stipulated to is capable of being fixed due to the nature of debt, it is liquidated. *Dautel v. Heritage Home Ctr., Inc.*, 89 Wn. App. 148, 154, 948 P.2d 397 (1997). Here the PUD stipulated not only that it owed a fixed amount, but that the fixed amount referred to the balance owed on Spradlin's work on Think of Me Hill and Neilton Point, a sum that constitutes liquidated damages.

¶51 At closing, the PUD contested only Spradlin's unliquidated claims and stated to the jury, "[W]e believe the proper amount [of damages] is $3,295,748 . . . for the balance of Think of Me Hill and for [Neilton Point]." RP (Feb. 24, 2010) at 781. Because the PUD argued that it owed Spradlin $3,295,748 on its outstanding invoices, a liquidated sum, the trial court did not abuse its discretion by awarding prejudgment interest on that amount of the jury's verdict. Although the PUD's attorney's remarks at closing were not evidence, the attorney's concession was based on the uncontroverted evidence at trial. *Green v. A.P.C.*, 136 Wn.2d 87, 100, 960 P.2d 912 (1998). Because the trial court did not abuse its discretion in ordering prejudgment interest, we need not address the PUD's argument that the trial court erred in awarding prejudgment interest on the alternative ground that there was a written public works contract.

VI. DENIAL OF SPECIAL VERDICT FORM

¶52 Finally, the PUD assigns error to the trial court's refusal to submit to the jury a proposed special verdict form. But the PUD does not elaborate on this assignment of error apart from the following sentence, "The PUD sought, and the trial court refused, a special verdict form that would have separated the damages. (CP 495-99)

*See Davis v. Microsoft Corp.*, 149 Wn.2d 521, 539-40, 70 P.3d 126 (2003) (requiring remand where defendant proposed 'a special verdict form that would have eliminated the uncertainty').” Br. of Appellant at 42. The PUD does not explain how the cited case applies to invalidate the trial court's refusal to submit its proposed special verdict form to the jury. Accordingly, we decline to address the PUD's contention. RAP 10.3(a); *Am. Legion Post No. 32 v. City of Walla Walla*, 116 Wn.2d 1, 7, 802 P.2d 784 (1991) (“In the absence of argument and citation to authority, an issue raised on appeal will not be considered.”); *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) (“Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.”).

¶53 We affirm.

Hunt and Johanson, JJ., concur.