IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| KASSA INSURANCE SERVICES, INC., a Washington Corporation, | ) ) ) | No. 31196-1-III (consolidated with No. 31300-0-III) |
| Respondent and Cross-Appellant, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| RYAN PUGH and JANE DOE PUGH, a Marital Community, and RJC/CAK, INC. a Washington Corporation, | ) ) ) ) | |
| Appellant. | ) ) | |

BROWN, J.—Insurance agent Ryan Pugh and insurance agency RJC/CAK, Inc.

(RJC) appeal the trial court's judgment awarded to Kassa Insurance Services, Inc.

(Kassa). The trial court decided Mr. Pugh had misappropriated trade secrets before he

left Kassa's agency to work with RJC and RJC had thereafter tortiously interfered with a

Kassa business expectancy. Mr. Pugh contends the trial court erred in (1) finding him

and his marital community liable for misappropriating trade secrets, (2) calculating

damages and awarding prejudgment interest, (3) disallowing his mitigation of damages

affirmative defense, and (4) awarding Kassa attorney fees and costs. RJC contends the

trial court erred in finding tortious interference liability, calculating damages, and

awarding prejudgment interest. On cross appeal, Kassa contends the trial court erred in failing to hold RJC vicariously liable for misappropriating trade secrets. We affirm all but remand to vacate the awards of prejudgment interest against Mr. Pugh and RJC, and to modify the cost award.

## FACTS

Tim Kassa incorporated Kassa in 1998 as an insurance claims-adjusting firm in Spokane. In late 2002 or early 2003, Mr. Kassa decided to sell insurance as well, and added an agency department on a separate floor of his business. Mr. Kassa hired Mr. Pugh out of college as an agent in his new department. Mr. Kassa trained Mr. Pugh and paid him a combination of salary and commission. Mr. Pugh developed clients by "cold calling," getting referrals, and following leads from other Kassa employees. Report of Proceedings (RP) at 76.

Mr. Pugh had no written employment contract and no noncompete covenant. In about August 2005, he asked Mr. Kassa for a written employment agreement to, in part, establish his ownership of the "book of business," the client list he developed at Kassa. RP at 284. But after Mr. Kassa initially agreed to run Mr. Pugh's contract suggestions by an attorney, Mr. Kassa decided a written agreement was unnecessary. Mr. Pugh asserts he was told he had a right to his book of business; Mr. Kassa disagrees.

On February 7, 2007, before he had two employment discussions with RJC owner Joe Connor, Mr. Pugh had a chance discussion with someone from RJC about employment there. Five days later, late on Sunday night, Mr. Pugh and his wife went to

2

Kassa's office and began preparing a list of clients he worked with, using information from the file folders kept behind the reception desk. He sent the list to his home e-mail address. Mr. Kassa and his wife happened to drive by the office while Mr. Pugh was there and asked him the next day what he had been doing. He told them his home computer was broken, so he had been working on his taxes at the office.

When Mr. Pugh told Mr. Kassa on February 27 he was taking a job at another agency, Mr. Kassa asked Mr. Pugh not to sabotage Kassa by taking client information with him. Mr. Pugh insisted he owned his book of business, but Mr. Kassa disagreed and threatened to sue. Mr. Kassa later agreed to pay Mr. Pugh for the commissions he earned after leaving Kassa through the date he began working for RJC.

On March 1, 2007, Mr. Pugh signed an employment agreement with RJC and began working there as an insurance agent. The agreement provided Mr. Pugh was 100 percent vested in deferred compensation for commissions he brought to RJC from the first day of employment, unlike other new employees who typically waited five years.

Mr. Pugh immediately began calling the more than 300 people on the client list. Within his first month at RJC, he had contacted most on the list and had sent out "agent of record" change forms to formally transfer their policies from Kassa to RJC. Exs. 16, 17. Once the agent of record forms had been signed and the policies were renewed, the clients were placed in RJC's files. According to Mr. Kassa, within two weeks after Mr. Pugh began at RJC, Kassa received 160 of 260 agent of record change forms. Mr.

3

Kassa testified the lost clients—around 135 families, some with multiple policies—represented a $40,000 per year loss to the agency for the three years it took to recover.

In April 2007, Kassa entered into an agreement to perform adjusting services for Continental Western Group, which writes commercial insurance. Tonia Kassa, Mr. Kassa's wife, was primarily responsible for adjusting Continental claims. She testified she had never received a complaint from Continental and the number of claims received from the insurance group steadily increased over time. In May 2008, Continental stopped sending claims to Kassa. Later, Mr. Kassa heard from a Continental employee that an agency had called Continental, asserted it was a conflict of interest for Kassa to both sell insurance and adjust claims from other agencies, and demanded Continental not use Kassa for adjusting services. Over defense objections, Mr. Kassa testified he later read interoffice e-mails from Continental indicating someone from RJC complained Kassa had tried to "drum up business" while adjusting claims for Continental. RP at 126.

In August 2008, Kassa sued, alleging (1) Mr. Pugh misappropriated trade secrets and breached his employment contract, and (2) RJC vicariously misappropriated trade secrets and tortiously interfered with a business expectancy. Kassa later abandoned a consumer protection claim against RJC. After a bench trial, the court found in favor of Kassa on all claims against Mr. Pugh. The trial court dismissed the vicarious liability claim against RJC, but concluded RJC tortiously interfered with Kassa's business expectancies. Mr. Pugh was ordered to pay Kassa $84,640, including doubled

4

exemplary damages, for willful and malicious misappropriation of trade secrets, plus $17,738 for unjust enrichment. The trial court ordered Mr. Pugh to pay Kassa $156,388 in attorney fees, $21,482 in costs, and $37,950 in prejudgment interest. Kassa was awarded $86,000 from RJC, plus $18,481 in prejudgment interest. Mr. Pugh and RJC appealed. Kassa cross appealed.

## ANALYSIS

### A. Misappropriation of Trade Secrets

The issue is whether the trial court erred in concluding Mr. Pugh misappropriated trade secrets under Washington's Uniform Trade Secrets Act (UTSA), chapter 19.108 RCW. Mr. Pugh contends the client list is not a trade secret, and even if it were, he did not willfully and maliciously misappropriate it. After a bench trial, our review is limited to determining whether substantial evidence supports the trial court's findings of fact, and if so, whether the findings support the trial court's conclusions of law and judgment. *Saviano v. Westport Amusements, Inc.*, 144 Wn. App. 72, 78, 180 P.3d 874 (2008). Unchallenged findings are treated as verities on appeal. *Nordstrom Credit, Inc. v. Dep't of Revenue*, 120 Wn.2d 935, 941, 845 P.2d 1331 (1993).

Generally, employees like Mr. Pugh, who do not sign an agreement not to compete, are free to engage in competitive employment after leaving an employer. *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427, 437, 971 P.2d 936 (1999). This means the former employee "may freely use general knowledge, skills, and experience acquired under his or her former employer." *Id.* But the former employee "remains

5

under a duty not to use or disclose, to the detriment of the former employer, trade secrets acquired in the course of previous employment." *Id.*

Although the definition of a trade secret is a matter of law, the determination of whether specific information is a trade secret is a question of fact. *West v. Port of Olympia*, 146 Wn. App. 108, 120, 192 P.3d 926 (2008). Plaintiffs asserting a trade secrets claim under the UTSA must first prove the existence of legally protectable secrets. *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 49, 738 P.2d 665 (1987). The UTSA defines a trade secret as

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

RCW 19.108.010(4)(a)(b).

The trial court found that substantial, uncontroverted evidence from all of the parties indicated the Kassa client list, or book of business, had independent economic value, "although the amount of that value was in dispute." Clerk's Papers (CP) at 866. Mr. Pugh argues the list of names, policy numbers, telephone numbers, and addresses does not constitute a protectable trade secret because the information was a public commodity and was easily ascertainable by any insurance agent with access to a marketing service.

6

As noted in *Boeing*, 108 Wn.2d at 50, a trade secrets plaintiff does not need to prove that every element of a compilation of information is unavailable elsewhere. "Such a burden would be insurmountable since trade secrets frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets." *Id.* A confidential customer list generally is a trade secret if the information in it is not readily accessible from trade directories or telephone books and is the result of effort and expense on the employer's part. *Nowogroski*, 137 Wn.2d at 441-42; *Thola v. Henschell*, 140 Wn. App. 70, 78, 164 P.3d 524 (2007).[1] Such a list may be "entitled to trade secret protection if the claimant demonstrates it compiled the list by expending substantial efforts to identify and cultivate its customer base such that it would be difficult for a competitor to acquire or duplicate the same information." *Calisi v. Unified Fin. Servs., LLC*, 232 Ariz. 103, 107, 302 P.3d 628 (2013) (applying Arizona's UTSA, which employs the same definition of "trade secret"). *See also McCallum v. Allstate Prop. & Cas. Ins. Co.*, 149 Wn. App. 412, 424, 204 P.3d 944 (2000) (a key factor in determining whether information has economic value under the UTSA is the effort and expense that was expended to develop the information).

The trial court found when Kassa started selling insurance, it "decided that clientele would be generated from scratch" rather than from the purchase of a book of business from a marketing service. CP at 863. Mr. Pugh did not assign error to this finding of fact, and it is therefore a verity on appeal. *Nordstrom Credit*, 120 Wn.2d at

---

[1] In *Nowogroski* and *Thola*, the appellants did not dispute the fact that the information was trade secrets. *Nowogroski* held that even memorized client information

941. Mr. Kassa described substantial efforts to establish a customer base from cold calls, referrals, acquaintances, leads from Kassa employees, and some leads that were bought from an online lead service. He testified Mr. Pugh's salary did not equal the commissions from these customers until four years after Mr. Pugh was employed. Although the telephone numbers and addresses of the customers may have been readily ascertainable in a telephone book, the names of the policyholders had been obtained with substantial effort. Moreover, the nonpublic policy numbers of each customer—many of them with multiple insurance policies through Kassa—are included on the list. These policy numbers may be used to access extensive policy information, including a customer's Social Security number, education, career, family members, birthdays, driver's license, and home and vehicle details. Mr. Pugh obtained economic value by using the list to elicit transfers of Kassa customers to RJC. Under these circumstances, the client list satisfies the first element of a trade secret under RCW 19.108.010(4)(a).

Mr. Pugh argues Kassa did not use reasonable efforts to maintain the secrecy of the client information, the second element of a protectable trade secret. RCW 19.108.010(4)(b). The evidence, however, supports the trial court's finding that "Kassa employed efforts that were reasonable under the circumstances to maintain the secrecy of the client lists." CP at 866. Mr. Kassa testified that Kassa kept its master client list password-protected on the computer and the individual client files in paper folders in a

---

could be a confidential trade secret. 137 Wn.2d at 450.

protected area unavailable to the public. Solely employees had keys to the building. During company meetings and employee training, he testified, client confidentiality was frequently discussed and the employees were told that client information was not to be taken out of the office. Kassa's administrator, Julie Kemink, testified that the company had periodic meetings on policy, including the confidentiality of client information. She testified the insurance companies they represented required this security.

Mr. Pugh argues any secrecy was lost when Kassa sent him monthly commission statements containing the client names and policy numbers. By doing so, he contends, Kassa was "free, open and reckless" with the client information. Appellant's (Pugh) Br. at 20. The nature of the employment relationship, however, "imposes a duty on employees and former employees not to use or disclose the employer's trade secrets." *Nowogroski*, 137 Wn.2d at 439. Otherwise secret client information does not lose its confidentiality just because it is revealed to a former employee who is entitled to that information and who is under a duty not to disclose it. While Mr. Pugh correctly notes he received a commission statement from Kassa containing some client names and policy numbers after he started working for RJC, Mr. Pugh had already taken this information and had begun contacting these clients by that time. On balance, we conclude sufficient evidence supports the trial court's finding that the client list, or book of business, was a confidential trade secret. *West*, 146 Wn. App. at 120.

Finally, Mr. Pugh argues the client list was not willfully and maliciously misappropriated under RCW 19.108.010(2) and RCW 19.108.030(1). Relevant to these facts, "misappropriation" is the disclosure or use of a trade secret without express or implied consent by a person who has reason to know that the knowledge of the trade secret was "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use," or "derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." RCW 19.108.010(2)(b)(ii). If the misappropriation is willful and malicious, the court may award exemplary damages up to twice the actual damages. RCW 19.108.030.

Mr. Pugh argues he thought he owned the client list or at least thought he had Mr. Kassa's consent to use it. But the record shows Mr. Pugh went to Kassa late on a Sunday night before he left employment, compiled the client list from the paper files and e-mailed them to his home address "in a clandestine manner." CP at 865. Asked the next day what he had been doing after business hours, he falsely claimed he had been working on his taxes. When he told Mr. Kassa he was quitting and Mr. Kassa told him not to take client information, Mr. Pugh did not reveal he had already e-mailed the information to his home computer. As the trial court stated, "One who believed he truly owned the lists might reasonably be expected to inform his employer of the e-mail transmission of the client lists." CP at 865. Substantial evidence supports the trial court's finding that Mr. Pugh intentionally took the confidential client information without permission, misappropriating Kassa's trade secrets.

10

A trial court's decision to award exemplary damages for willful and malicious misappropriation under UTSA is discretionary and will not be reversed unless the trial court clearly abused its discretion. *Boeing*, 108 Wn.2d at 61-62; *Thola*, 140 Wn. App. at 89. Because neither "willful" nor "malicious" is defined by statute, we resort to dictionary definitions for clarification. *State v. Kintz*, 169 Wn.2d 537, 547, 238 P.3d 470 (2010). "Willful" is synonymous with "voluntary" and "intentional." BLACK'S LAW DICTIONARY 1630 (8th ed. 2004). And "malicious" is defined as "1. Substantially certain to cause injury. 2. Without just cause or excuse." BLACK'S, *supra*, at 977. The record shows Mr. Pugh knew he acted with dubious legality, clandestinely obtained the client list, and intentionally took and used the client list for his own advantage. Substantial evidence supports the conclusion that his misappropriation was voluntary, substantially certain to cause injury to Kassa, and without just cause or excuse. Accordingly, the trial court did not clearly abuse its discretion in concluding Mr. Pugh willfully and maliciously misappropriated trade secrets. *See Boeing*, 108 Wn.2d at 62.

## B. Marital Community Liability

The issue is whether the trial court properly awarded judgment against the Pugh marital community for the intentional tort of willful and malicious misappropriation of trade secrets. Mr. Pugh contends the marital community is not liable for his individual tort. Whether Kassa's claims against Mr. Pugh implicate the Pughs' community property is a mixed question of fact and law we review de novo. *Clayton v. Wilson*, 168 Wn.2d 57, 62, 227 P.3d 278 (2010).

11

Generally a marital community is not liable for the spouse's torts unless the wrongful act either (1) "'results [in] or is intended to result in a benefit to the community,'" or (2) is committed while engaged in the business of the community. *Id.* at 63 (quoting *LaFramboise v. Schmidt*, 42 Wn.2d 198, 200, 254 P.2d 485 (1953)). Mr. Pugh was accompanied by his wife when he collected, copied, and e-mailed the client list to his home computer. The client information was used by him to benefit his work at RJC and to benefit the community's income. His tort resulted in a benefit to the community and was committed while engaged in the community's business. Thus, substantial evidence supports the trial court's award against the Pugh marital community for Mr. Pugh's tort.

B. Damage Calculations, Mitigating Damages, and Prejudgment Interest

The issue is whether the trial court erred in calculating the damages award against the Pughs, disallowing their mitigation affirmative defense, and awarding prejudgment interest against them. We review a damages award for abuse of discretion. *Banuelos v. TSA Wash., Inc.*, 134 Wn. App. 607, 613, 141 P.3d 652 (2006). *See also Boeing*, 108 Wn.2d at 61-62 (the decision to award exemplary damages under RCW 19.108.030(2) is discretionary and the amount awarded will not be reversed unless clearly erroneous). A trial court's award of damages will be reversed if it is outside the range of relevant evidence, shocks the conscience, or results from passion or prejudice. *Mason v. Mortg. Am., Inc.*, 114 Wn.2d 842, 850, 792 P.2d 142 (1990).

12

Under RCW 19.108.030(1), the complainant in an action for misappropriation of trade secrets may recover damages "for the actual loss caused by misappropriation." Traditionally, these damages are calculated by determining the profits on sales attributed to the use of the trade secrets. *Petters v. Williamson & Assoc., Inc.*, 151 Wn. App. 154, 165, 210 P.3d 1048 (2009) (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. f., at 516-17 (1995)).

At trial, Kassa presented the testimony of Dan Harper, a certified public accountant experienced in forensic accounting and business valuation, to show how the transfer of clients to RJC economically impacted Kassa. According to his research, RJC earned commissions of approximately $30,366 in 2008 on former Kassa accounts. Taking into account that insurance agencies from 2007 through 2008 experienced "slow organic growth" affecting the sale value of an agency's book of business, Mr. Harper estimated the sale value of Kassa's lost accounts was 1.5 times RJC's commissions, or $42,320. RP at 311, 320. He opined this was a conservative estimate of the economic consequences to Kassa of losing these accounts to RJC, and he estimated the value of the accounts to RJC was actually three times that amount. Mr. Kassa testified he estimated losses of around $40,000 per year for the 5 years it took his agency to recover from the loss of the accounts, for a total of $200,000.

The trial court adopted Mr. Harper's calculations and concluded Kassa's actual damages were $42,320. Mr. Pugh argues Mr. Harper's estimate fails to take into account the testimony of his expert, Thomas Lees, who calculated the total

13

commissions for Kassa accounts transferred to RJC in 2007 and 2008 were close to $19,000, but discounted this by .75 based on what he considered a lack of profitability in the Kassa client list due to the lack of goodwill or of a noncompete agreement. Although he did not do the math, $19,000 times .75 is $14,250.

Thus, the range of evidence before the trial court was $14,250 to $200,000. Mr. Harper's $42,320 damages estimate for Mr. Pugh's misappropriation of Kassa's trade secrets was well within the range of evidence. The trial court then properly exercised its discretion to double the damages to $84,640 under RCW 19.108.030(2) for willful and malicious misappropriation. Because the trial court's computation of damages for Mr. Pugh's misappropriation of trade secrets is within the range of credible evidence, we find no abuse of discretion.

The UTSA specifically allows damages for unjust enrichment: "A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss." RCW 19.108.030(1). The trial court awarded Kassa $17,738 for the value vested in Mr. Pugh's deferred compensation for commissions brought to RJC from Kassa. The court adopted the calculations in Mr. Harper's written financial analysis, which multiplied the annual premiums produced by Mr. Pugh at RJC by an estimated premium renewal rate of 11 percent to get a total of $19,535, reduced by present value to $17,738.[2] Mr. Pugh argues the award cannot be

---

[2] At trial, Mr. Harper related RJC's annual premiums produced by Mr. Pugh were higher: $210,914. He related the actual value of the unjust enrichment was therefore 11 percent of $210,914, or $20,656.

14

justified because the deferred compensation amount will be unknown until five years after he retires from RJC, an unknown date. He points out his evidence shows insurance renewals actually deplete by 15 percent annually.

Although the amount recoverable for unjust enrichment may be difficult to ascertain with preciseness, Kassa is entitled to compensation under RCW 19.108.030(1). Mr. Pugh's 100 percent deferred compensation vesting for commissions he brought to RJC is a benefit to him separate from the damages Kassa suffered for the actual loss of the clients and directly arises from the misappropriated client information. The difficulty of proving the exact damages for this unjust enrichment should not profit the tortfeasor. *See Box v. Crowther*, 3 Wn. App. 67, 75, 473 P.2d 417 (1970) (discussing damages for lost profits). The trial court's unjust enrichment award is within the range of credible evidence and is therefore a proper exercise of discretion. *Mason*, 114 Wn.2d at 850.

Mr. Pugh contends the trial court erroneously refused to consider his mitigation of damages affirmative defense because Kassa waited over a year to file suit. He argues Kassa should have attempted to prevent the solicitation of its clients by seeking an injunction under RCW 19.108.020 or at least by protesting. He notes Kassa actually agreed to pay Mr. Pugh commissions earned on the accounts after he left Kassa, up to the date Mr. Pugh began working for RJC.

The doctrine of avoidable consequences, also called mitigation of damages, prevents recovery of damages the injured party could have avoided with reasonable

effort. *Bullard v. Bailey*, 91 Wn. App. 750, 759, 959 P.2d 1122 (1998); *Cobb v. Snohomish County*, 86 Wn. App. 223, 230, 935 P.2d 1384 (1997). The wrongdoer has the burden to prove the failure to mitigate. *Bullard*, 91 Wn. App. at 759-60; *Cobb*, 86 Wn. App. at 230. The doctrine requires the plaintiff to act as a reasonable person: "'If a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than the other is chosen.'" *Cobb*, 86 Wn. App. at 233 (quoting *Hoglund v. Klein*, 49 Wn.2d 216, 221, 298 P.2d 1099 (1956)). Additionally, if the damages arise from intentional conduct, no duty to mitigate arises. *Bullard*, 91 Wn. App. at 760; *Cobb*, 86 Wn. App. at 232.

The UTSA specifically affords the injured plaintiff a choice of remedies: an injunction and/or damages for the actual loss caused by misappropriation of trade secrets. RCW 19.108.020(1), .030(1). Because most of the clients on the misappropriated list had been contacted about moving their accounts to RJC within the first month after Mr. Pugh left Kassa, an injunction had little likelihood of turning the tide. The choice of a suit for damages was reasonable as a result. And, the trial court found Mr. Pugh's misappropriation was willful and malicious. Accordingly, the doctrine of avoidable consequences was unavailable to him. *Bullard*, 91 Wn. App. at 760; *Cobb*, 86 Wn. App. at 232.

The court ordered Mr. Pugh to pay $37,949.66 in prejudgment interest. He contends prejudgment interest is inappropriate because Kassa's damages due to the misappropriation are unliquidated. We review a trial court's award of prejudgment

16

interest for abuse of discretion. *Scoccolo Constr., Inc. v. City of Renton*, 158 Wn.2d 506, 519, 145 P.3d 371 (2006). The trial court abuses its discretion if its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Prejudgment interest is appropriate if the damages amount claimed is liquidated. *Dep't of Corr. v. Fluor Daniel, Inc.*, 160 Wn.2d 786, 789, 161 P.3d 372 (2007); *Spradlin Rock Prods., Inc. v. Pub. Util. Dist. No. 1 of Grays Harbor County*, 164 Wn. App. 641, 665, 266 P.3d 229 (2011). Damages are "liquidated" if they can be determined by reference to a fixed standard or if the evidence provides data that makes it possible to compute the amount with exactness, without reliance on opinion or discretion. *Fluor*, 160 Wn.2d at 789; *Spradlin*, 164 Wn. App. at 665. "It is the character of the original claim, rather than the court's ultimate method for awarding damages, that determines whether prejudgment interest is allowable." *Spradlin*, 164 Wn. App. at 665 (citing *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 33, 442 P.2d 621 (1968)). Damages "that cannot be calculated without the use of discretion are not liquidated." *Fluor*, 160 Wn.2d at 790. That a claim is disputed does not render it unliquidated, as long as the damages may be determined by reference to an objective source, such as fair market value. *Egerer v. CSR West, LLC*, 116 Wn. App. 645, 653, 67 P.3d 1128 (2003).

The trial court ordered Mr. Pugh to pay prejudgment interest on the trade secrets misappropriation and unjust enrichment damages. As discussed above, the court had disputed testimony concerning the proper method of calculating Kassa's losses due to

those claims. The trial court exercised discretion to determine which of the expert and lay opinions to rely upon, without a fixed standard provided by contract term, statute, or objective source. Calculation of the unjust enrichment damages was complicated by the uncertainty of the value of the deferred compensation related to commissions from former Kassa clients. Accordingly, Kassa's claims for damages against Mr. Pugh were uncertain, and therefore not liquidated. *Fluor*, 160 Wn.2d at 789; *Spradlin*, 164 Wn. App. at 665; *Douglas Nw., Inc. v. Bill O'Brien & Sons Constr., Inc.*, 64 Wn. App. 661, 691-92, 828 P.2d 565 (1992).[3] Thus, the trial court's award of prejudgment interest against Mr. Pugh was exercised on untenable grounds. Therefore, we conclude the trial court abused its discretion and reverse solely the prejudgment interest portion of the judgment against Mr. Pugh. *Carroll*, 79 Wn.2d at 26.

### C. Attorney Fees and Costs

The issue is whether the trial court erred in its award of attorney fees and costs. Under RCW 19.108.040, a trial court may award reasonable attorney fees to the prevailing party on a claim of willful and malicious misappropriation of trade secrets. Review of an attorney fees award is for abuse of discretion. *Chuong Van Pham v. Seattle City Light*, 159 Wn.2d 527, 538, 151 P.3d 976 (2007); *Boeing*, 108 Wn.2d at 65.

---

[3] We note prejudgment interest is generally disallowed for exemplary damages, such as the double damages awarded here for willful and malicious misappropriation of trade secrets. *See Blake v. Grant*, 65 Wn.2d 410, 413, 397 P.2d 843 (1964); *JDFJ Corp. v. Int'l Raceway, Inc.*, 97 Wn. App. 1, 10, 970 P.2d 343 (1999); *Ventoza v. Anderson*, 14 Wn. App. 882, 897, 545 P.2d 1219 (1976) (timber trespass cases under RCW 64.12.030, concerning treble damages for waste).

In exercising its discretion to award attorney fees and costs, a trial court uses the lodestar formula, determining the number of hours reasonably expended on the successful claims and multiplying that number by the reasonable hourly rate of the various attorneys. *See Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983) (lodestar factors). The attorneys must provide reasonable documentation of the work they performed indicating the number of hours worked, the type of work, and the category of attorney who did the work. *Id.* "This documentation need not be exhaustive or in minute detail." *Id.* But the documentation must show which hours were spent on unsuccessful claims, duplicated effort, or otherwise unproductive time. *Id.* The award of fees generally is limited to fees attributable to successful claims if unrelated and separable from the unsuccessful claims. *Brand v. Dep't of Labor & Indus.*, 139 Wn.2d 659, 672, 989 P.2d 1111 (1999). But in cases where the claims for relief involve a common core of facts, and much of the attorneys' time is devoted generally to the litigation as a whole, the court may award attorney fees on all of the issues. *Id.* at 672-73. After determining the number of hours reasonably expended on recoverable claims, the trial court then multiplies that number by the reasonable hourly rate of compensation. *Id.* Usually the attorneys' established hourly rate is considered a reasonable rate. *Id.*

The trial court considered affidavits from two law firms representing Kassa and applied the lodestar formula. The attorneys provided reasonable documentation for the hours worked, discounting the time spent on anything other than the trade secrets

19

claim, duplicated effort, and other unproductive time. They documented the work performed by each attorney and the established hourly rate of each. *Bowers*, 100 Wn.2d at 597.

Mr. Pugh argues Kassa's attorneys grossly exaggerated the time spent on the successful trade secrets claim. In its findings of fact and conclusions of law in support of the attorney fees award, however, the trial court states it "conducted an independent analysis of the work" dedicated to pursuing the trade secrets claim and concluded that this claim "arose out of a common core of facts that overlapped with other claims." CP at 1004. The court reviewed the adjustments Kassa's attorneys made for nonrecoverable claims, duplicative work, and other issues, and found the reduction adopted by the attorneys was "fairly allocated." *Id.* Finally, the trial court found the hourly rates were reasonable. Thus, the trial court properly exercised its discretion in determining the award of attorney fees. Mr. Pugh unpersuasively argues the trial court did not address his specific challenges but the findings address the lodestar formula with sufficient specificity for us to conclude the court did not abuse its discretion.

Mr. Pugh argues the court erred in awarding costs, first because the cost bill was not properly filed within the 10-day period after judgment was entered as required by RCW 4.84.090. But the record shows judgment was entered on June 8, 2012, and the affidavits of the attorneys in support of fees and costs were filed on June 15, 2012,

within 10 days.[4] Second, Mr. Pugh argues not all of the claimed costs are recoverable under RCW 4.84.010. He claims the witness fee for Mr. Harper is not authorized.

In awarding attorney fees and costs, Washington follows the American rule, which provides that fees and expenses generally are not recoverable except by specific statutory authority, contractual provision, or recognized ground in equity. *Wagner v. Foote*, 128 Wn.2d 408, 416, 908 P.2d 884 (1996). An expert witness's charges are not authorized by statute or court rule and are not a proper element of damages or costs. *Id.* at 416-17; *Estep v. Hamilton*, 148 Wn. App. 246, 263, 201 P.3d 331 (2009). *See* RCW 4.84.010 (definition of costs), .030 (costs available to prevailing party), .080 (attorney fees as costs); RCW 2.40.010 (witness fees and mileage). As stated in *Fiorito v. Goerig*, 27 Wn.2d 615, 620, 179 P.2d 316 (1947), "[w]here an expert is employed and is acting for one of the parties, it is not proper to charge the allowance of fees for such expert against the losing party as part of the costs of the action." (Quoted in *Wagner*, 128 Wn.2d at 417-18, and in *Estep*, 148 Wn. App. at 263).

The costs awarded to Kassa include the professional fee for Kassa's expert witness, Dan Harper. One of the two law firms representing Kassa at trial submitted a cost bill affidavit stating that Mr. Harper's total charges for this case were $14,867, which were then reduced by $2,230.05 for the time Mr. Harper spent on unsuccessful claims. Thus, the portion of the trial court's $21,482.02 award of costs to Kassa that

---

[4] Without authority, Mr. Pugh appears to argue the affidavits with exhibits are not a cost bill. RCW 4.84.090 states the request for necessary disbursements "shall be stated in detail and verified by affidavit" and served on the opposing party and filed with the court within 10 days. The affidavits and attachments suffice.

related to Mr. Harper's expert witness fee was $12,636.95. Because we conclude the trial court erred in awarding the expert witness fee, the award of costs is reversed and will be reduced by $12,636.95.

### D. Tortious Interference

The issue is whether the trial court erred in concluding RJC was liable for tortious interference with Kassa's business contract or expectancy with Continental. We review whether the trial court's findings are supported by substantial evidence and whether the findings support the conclusions of law. *Saviano*, 144 Wn. App. at 78.

A claim of tortious interference with a business contract or expectancy requires evidence of (1) the existence of a valid contractual relationship or business expectancy of which the defendant had knowledge; (2) intentional interference, with an improper purpose or improper means, that causes breach or termination of the relationship; and (3) resultant damages. *Elcon Constr., Inc. v. Eastern Wash. Univ.*, 174 Wn.2d 157, 168, 273 P.3d 965 (2012); *Manna Funding, LLC v. Kittitas County*, 173 Wn. App. 879, 897, 295 P.3d 1197, *review denied*, 178 Wn.2d 1007 (2013). A "business expectancy" is any prospective contractual or business relationship or reasonable expectation that a business relationship will continue. *F.D. Hill & Co. v. Wallerich*, 67 Wn.2d 409, 413, 407 P.2d 956 (1965); *Manna*, 173 Wn. App. at 897. This relationship must be of pecuniary value and must be known to the one interfering. *Manna*, 173 Wn. App. at 897. Evidence of purposeful interference denotes purposefully improper interference. *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288

22

(1997). Exercising a legal interest in good faith is not improper interference. *Elcon*, 174 Wn.2d at 168.

The trial court found Kassa had entered into a claims adjusting contract with Continental in April 2007 that ran through late May 2008, when Continental stopped sending claims to Kassa. Kassa had been recommended to Continental by others in the insurance industry. Ms. Kassa, who primarily performed claims adjusting for Continental, reported she had never received complaints about her work. The court further found the agreement with Continental was abruptly terminated after Continental received a complaint about Kassa's alleged conflict of interest and "an assertion of Kassa misusing contacts with adjusting business clients to generate sales business." CP at 869. RJC admits Mr. Connor was the one who complained to Continental:

> Defendant admits that it was Mr. Connor who made the complaint to Continental Western. The precipitating event for Mr. Connor's call to Continental Western occurred when Mr. Connor learned that one of his clients' claims was assigned to Kassa to do the adjusting around the relevant time period as discussed here.

CP at 869. RJC does not assign error to the trial court's findings that it is a "primary customer" of and does significant business with Continental, and that Kassa's adjusting agreement with Continental was terminated immediately after Mr. Connor lodged his complaint. CP at 871. These unrefuted facts establish an ongoing business contract or expectancy between Kassa and Continental, as well as intentional interference that induced the termination of that relationship.

23

RJC argues Mr. Connor did not ask Continental to stop sending all of its claims to Kassa, solely claims from RJC's clients. Mr. Connor testified he told a Continental agent his company had "bad vibes" with Kassa and he did not think it was right for Kassa to both adjust claims and sell insurance policies because this was a conflict of interest. According to Mr. Connor, he had talked to other people and believed Kassa's roles as insurance agency and claims adjuster would be considered a conflict of interest industry-wide. Thus, RJC argues, Mr. Connor's complaint was a good faith effort to protect a legitimate business interest.

But the record shows RJC did more than ask Continental to protect RJC's interests in its clients. RJC accused Kassa of unethical business behavior. Mr. Connor told the Continental agent that by selling insurance as well as adjusting claims for other insurance agencies, Kassa had a conflict of interest. Ms. Kassa testified she understood Mr. Connor had told someone at Continental that Kassa had attempted to "cross-sell" to one of RJC's insureds. RP at 155.

RJC argues the real basis for the trial court's interference conclusion was improper reliance on exhibit 34. In its letter opinion, the trial court cited exhibit 34: e-mail communications between executives at Continental. These e-mails indicate someone from RJC had called and complained that Kassa "'has tried to drum up business when adjusting claims'" for Continental. CP at 889. At trial, exhibit 34 was rejected as hearsay. But Mr. Kassa was later allowed to state he only learned why Continental had terminated the agreement when he read

24

Continental's interoffice e-mails. Over RJC's objection, the trial court allowed this testimony as "state of mind" evidence under ER 803(a)(3). RP at 126. Mr. Kassa then related he learned an RJC agent called Continental and claimed Kassa was trying to "drum up business" while adjusting claims for Continental. RP at 126.

"Hearsay is an out-of-court statement offered for the truth of the matter asserted, and it is generally inadmissible absent an applicable exception." *Domingo v. Boeing Employees' Credit Union*, 124 Wn. App. 71, 79, 98 P.3d 1222 (2004). Under the hearsay exception of ER 803(a)(3), a party is permitted to present a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition . . . , but not including a statement of memory or belief to prove the fact remembered or believed." Exhibit 34, containing out-of-court statements by Continental executives, was properly excluded as hearsay to the extent it was offered to prove Continental terminated the adjusting agreement because RJC told it Kassa was improperly soliciting clients. Reference to this hearsay by Mr. Kassa is relevant to Mr. Kassa's then existing state of mind solely to the extent it explains why he finally decided to file a suit against RJC.

In response to RJC's objections to the trial court's reliance on exhibit 34, the court reconsidered its letter opinion and sent another letter to the parties before final judgment. Noting that later testimony addressed the same subject matter, the trial court concluded its reference to exhibit 34 was harmless error

25

because the outcome was the same. No reference to exhibit 34 is in the trial court's findings of fact and conclusions of law. The findings instead refer to evidence that Continental had been satisfied with Kassa's adjusting work and had been abruptly terminated after Mr. Connor complained about a conflict of interest and misuse of contacts to generate sales. The unchallenged testimony of Mr. Connor and Ms. Kassa supports this finding. The trial court found Continental had terminated the Kassa agreement because RJC was a primary customer with significant Continental business. Finally, the trial court found RJC had provided insufficient evidence of the alleged conflict of interest. As the trial court stated, "Mr. Mallory's 'common sense' characterization of a conflict of interest does not make it so." CP at 871.

In sum, we hold the trial court did not err in concluding that RJC was liable for tortious interference with a contract or expectancy.

### E. Damages Calculations for Tortious Interference

The issue is whether the trial court erred in awarding $86,000 in damages for RJC's tortious interference with a business contract, plus $18,480.57 in prejudgment interest. Our review is for abuse of discretion. *Banuelos*, 134 Wn. App. at 613.

Generally, damages must be established with reasonable certainty. *Lewis River Golf, Inc. v. O.M. Scott & Sons*, 120 Wn.2d 712, 717, 845 P.2d 987 (1993). This certainty relates more to the fact of damage rather than to the amount of damages. *Id.* Once the loss is proved with certainty, uncertainty or difficulty in determining the amount

26

of the loss will not prevent recovery. *Id.* at 717-18. Although mathematical certainty is not required, the amount of damages must be supported by competent evidence. *Fed. Signal Corp. v. Safety Factors, Inc.*, 125 Wn.2d 413, 443, 886 P.2d 172 (1994). Evidence of damage is sufficient if it gives the trier of fact a reasonable basis for estimating the loss and does not require mere speculation or conjecture. *Clayton v. Wilson*, 168 Wn.2d 57, 72, 227 P.3d 278 (2010).

When asked what losses Kassa had suffered in losing Continental's business, Mr. Kassa related the loss was hard to measure because Kassa had not adjusted claims for Continental for very long. But he noted Continental had been increasing its marketing in Spokane and estimated claims would have increased significantly. His administrator, Ms. Kassa, affirmed the number of claims from Continental had been steadily increasing before termination of the contract. Assuming the contract with Continental would have continued at least three more years, Mr. Kassa estimated the loss as $40,000 per year, for a total of $120,000.

Mr. Harper opined on the value of losing Continental's business. He determined Kassa earned on average a little over $6,000 in profits per year in the 16 months of its contract with Continental. He projected growth in the number of Continental claims to be adjusted, based on similar growth in the claims from another of Kassa's insurance agency clients. Without an increase in the number of claims, Mr. Harper calculated a static loss of about $26,000 after the contract ended in May 2008, but with the predicted growth rate, he estimated a total loss of $86,490. RJC provided no rebuttal evidence.

27

RJC argues the sole nonspeculative way to value the loss of the Continental account was by looking at the actual profits for one year, about $6,000. RJC points out the Continental contract was terminable at will. But considering the unrebutted findings that Continental appeared to be satisfied with Kassa's work and was increasingly relying on Kassa for claims adjustment, it was reasonably certain the Continental account would have continued long-term, as had Kassa's other adjusting accounts. RJC discounts Mr. Harper's capitalization approach to valuing the growth rate. Given that the trial court found Mr. Harper's testimony "persuasive and credible," RP at 891, we leave questions of witness credibility and evidence weight for the trier of fact. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 108, 864 P.2d 937 (1994).

Given all, we conclude the trial court did not err by abusing its discretion in awarding $86,000 because that amount is within the range of credible evidence received from Mr. Harper and Mr. Kassa discussed above. *Mason*, 114 Wn.2d at 850. But, considering the open-ended nature of the agreement between Kassa and Continental making it impossible to determine a liquidated sum for damages, we conclude the trial court erred by abusing its discretion in awarding Kassa $18,480.57 in prejudgment interest against RJC. The award cannot be computed with exactness, without reliance on opinion or discretion. *Fluor*, 160 Wn.2d at 789; *Spradlin*, 164 Wn. App. at 665.

28

F. Cross Appeal

The issue on cross appeal is whether the trial court erred in concluding that RJC was not vicariously liable for Mr. Pugh's misappropriation of trade secrets. We review whether substantial evidence supports the trial court's findings of fact and whether the findings support the conclusions of law. *Saviano*, 144 Wn. App. at 78.

Under the doctrine of respondeat superior, an employer or principal is vicariously responsible for the torts of an employee or agent who is acting on the employer's or principal's behalf. *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 48, 929 P.2d 420 (1997); *Thola*, 140 Wn. App. at 79. When the employee (or agent) steps aside from the employer's (or principal's) purposes and pursues a personal objective, the employer is not vicariously liable. *Id.* An employer is liable solely for an employee's activities over which the employer has a right of control. *Stephens v. Omni Ins. Co.*, 138 Wn. App. 151, 183, 159 P.3d 10 (2007). But an employer may become liable for the actions of even a future employee under a theory of ratification if the employer accepts the benefits of the acts with full knowledge of the facts. *See Riss v. Angel*, 131 Wn.2d 612, 636, 934 P.2d 669 (1997); *Thola*, 140 Wn. App. at 86, 88-89. An employer may be held vicariously responsible for violations of the UTSA. *Thola*, 140 Wn. App. at 81.

The trial court found RJC was not vicariously liable for Mr. Pugh's acts of misappropriation because (1) RJC had no control over his actions when he compiled the client list and e-mailed it to himself, and (2) Kassa failed to prove Mr. Connor knew

29

the list of clients did not belong to Mr. Pugh or that Mr. Pugh was violating an agreement with Kassa by taking the client list. The evidence supports these findings.

First, Kassa fails to show anyone at RJC had discussed the book of business with Mr. Pugh before he compiled the client list and sent it to his home e-mail address. Mr. Pugh admitted he compiled the list five days after he casually discussed employment at RJC with an RJC agent he ran into at a business lunch. The book of business had been misappropriated before Mr. Connor offered him a job. Kassa offers no countering evidence showing the act of misappropriation was completed after RJC had a right to control Mr. Pugh's actions.

Second, Kassa failed to present evidence showing RJC ratified Mr. Pugh's trade secrets misappropriation. Both Mr. Pugh and Mr. Connor related Mr. Pugh always asserted he owned his book of business. Mr. Pugh further related when Mr. Connor offered to buy his book of business from Kassa, Mr. Pugh told Mr. Connor that was unnecessary because he already owned it. And, Mr. Connor testified he was not very interested in Mr. Pugh's "personal lines" clients because RJC is predominantly a "commercial lines" agency.[5] RP at 584-85.

Although Mr. Connor admitted he advised Mr. Pugh to send out change of agent forms to validly transfer the clients from Kassa to RJC, this testimony does not establish that Mr. Connor or anyone at RJC knew Mr. Pugh had misappropriated the book of business. Mr. Connor's April 2007 call to Mr. Kassa offering to buy the book of

_____

[5] As of January 2008, RJC had Mr. Pugh devote himself entirely to commercial business clients.

business is also insufficient to rebut the balance of evidence showing no one at RJC knew Mr. Pugh had misappropriated the client list. The offer was made in the limited context of Mr. Kassa and Mr. Connor deciding how to split the commissions made on policies while Mr. Pugh worked for their respective companies.

In sum, despite Kassa's suggested inferences, contrary sufficient evidence, and inferences arising from that evidence, exist to support the trial court's findings that RJC had no right of control over Mr. Pugh for his acts of misappropriation before he began working for RJC. Additionally, when weighing the competing evidence and judging witness credibility, sufficient evidence exists for the trial court to reject RJC's ratification of Mr. Pugh's misappropriation. We conclude the trial court did not err in concluding that RJC was not vicariously liable for Mr. Pugh's tortious acts.

G. Appellate Attorney Fees and Costs

Kassa requests attorney fees and costs based on RAP 18.1 and RCW 19.108.040. Mr. Pugh and RJC briefly ask for similar fees and costs, but Mr. Pugh has not prevailed here, and is not entitled to either fees or costs.

RCW 19.108.040 authorizes reasonable attorney fees to the prevailing party in an action for willful and malicious misappropriation of trade secrets. Because Kassa has prevailed in this appeal against Mr. Pugh's UTSA challenge, Kassa is entitled to reasonable attorney fees for that portion of the appeal corresponding to Mr. Pugh's UTSA arguments. RAP 18.1; *Boeing*, 108 Wn.2d at 668; *Eagle Group, Inc. v. Pullen*, 114 Wn. App. 409, 424, 58 P.3d 292 (2003). RJC fails to support its request with

31

argument or authority. Accordingly, we have been provided no basis to award attorney fees or costs to RJC. *See Phillips Bldg. Co. v. An*, 81 Wn. App. 696, 705, 915 P.2d 1146 (1996) (a party seeking attorney fees and costs is required by RAP 18.1(b) to provide argument and citation to authority to establish that the expenses are warranted).

Affirmed but remanded to vacate prejudgment interest awards and to modify cost award consistent with this decision.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Brown, J.

WE CONCUR:

_____    _____
Korsmo, J.                                         Lawrence-Berrey, J.