# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| LESLIE BLAKEY SPENCER, an individual, and TAMMY S. BLAKEY, an individual | ) ) ) | No. 71036-2-I |
| | ) | |
| Appellants, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| NANCY BLAKEY, personal representative of THE ESTATE OF GREGORY B. BLAKEY, an individual and GLENDA BLAKEY, an individual | ) ) ) ) | UNPUBLISHED OPINION |
| | ) | |
| Respondents. | ) | FILED: March 30, 2015 |

SPEARMAN, C.J. — This appeal arises from a dispute over the management and sale of a commercial property, owned in equal parts by four siblings pursuant to a written co-tenancy agreement. The appellants challenge the trial court's summary judgment order dismissing their claim for specific performance of the default provision of the Agreement and granting specific performance of a provision authorizing sale to a third party absent agreement between the co-tenants. They also challenge the trial court's order finding that they failed to match a third party buyer's purchase offer and authorizing the sale of the property over their objection. Finally, they challenge the trial court's summary judgment dismissal of their breach of contract, bad faith, gross negligence, and breach of fiduciary duty claims. We affirm.

## FACTS

In 1993, Bruce Blakey, gifted his children, Gregory, Glenda, Leslie and Tammy,[1] equal ownership interests in a parcel of commercial property in Seattle, Washington. The property is a 1.33 acre parcel, which contains an empty 24,000 square foot warehouse and a large gravel parking area with room for 65 cars. The siblings took ownership of the property pursuant to a fully integrated, written co-tenancy agreement (Agreement), drafted by Bruce's attorney and signed by each sibling.

The Agreement contained various provisions that governed the management of the property. Paragraph 19 of the Agreement set forth the general requirement that the sale or leasing of the property must be approved by tenants owning more than fifty percent of the total undivided interests in the property. Paragraphs 12 and 13 provided exceptions to this general requirement in the event of default, material breach of contract, or deadlock between the tenants. Paragraph 6 provided for a "managing tenant" who would be elected "from time to time" by tenants owning more than fifty percent of the total undivided interests. (Clerk's Papers (CP) at 176. Paragraph 7 defined the scope of the managing tenant's authority as follows:

> complete, absolute and exclusive power and authority to manage the business and affairs of the Tenancy, to perform the administrative and ministerial functions of the Tenancy, and do any and all other acts ... necessary or convenient to accomplish the purposes and carry on the business and affairs of the Tenancy, provided, however, that the Managing Tenant shall not have the

---

[1] The parties are referred to by their first names for clarity. Gregory passed away while this appeal was pending. His estate is represented on appeal by Nancy Blakey.

power or authority to sell, lease, encumber, develop, improve, transfer or dispose of or enter into any agreement for the sale, leasing, encumbrance, development, improvement, transfer or disposition of the Property.

CP at 176-177. This provision also granted the managing tenant power of attorney over the Tenancy (Tenancy) and the property.

The Agreement expressly provided that Gregory would serve as the first managing tenant and it is undisputed that he retained that position until at least June 2007. The parties disagree as to who held the position after that date. Gregory and Glenda contend that Leslie assumed the duties of managing tenant in June or July 2007 when she took possession of the books and records of the Tenancy, closed the Tenancy's bank account for which Gregory was signatory, and opened a new Tenancy account with herself and Glenda as signatories.[2] They contend that thereafter Leslie managed the administrative and ministerial affairs of the Tenancy and held herself out to third parties as the managing tenant, until the fall of 2009 when Leslie deposited a box containing the books and records of the Tenancy at Glenda's place of employment and ceased fulfilling those duties.

During his tenure as managing tenant, Gregory was at all times the majority shareholder and president of Snopac, a crab and fish processing company founded by his father. From 1993 until February 2008, Snopac, without benefit of a written lease, occupied the entire property and paid the Tenancy $12,500 per month. Initially, Leslie, Tammy, and Glenda each held minority

---

[2] It is undisputed that no formal election replacing Gregory as managing tenant ever occurred.

3

interests in Snopac and consented to the company's occupation of the property. However, beginning in 2006 disputes arose between the siblings regarding the operation of Snopac, with resulting litigation. Gregory initiated a lawsuit in 2008 to redeem his sisters' minority interests in Snopac, which resulted in him buying out his sisters' interests in the company.[3] In February 2008, Gregory caused Snopac to vacate the property, leaving it unoccupied.

In March 2008, Leslie and Tammy proposed trying to lease the property. The parties exchanged several emails on this subject, in which Gregory and Glenda objected to leasing the property in its existing state. Both claimed that damage to the property from the 2001 Nisqually earthquake had rendered the building unsafe and subjected them to potential liability should a third party lease the building. Glenda refused to lease the property unless full disclosure of the damage was made. Gregory refused to lease unless the other tenants provided an indemnification for damages related to the building's deficiencies. Instead, Gregory and Glenda both expressed interest in selling the building to a third party "as is." CP at 1133, 1155. Glenda also offered to sell her ownership interest to Tammy for $600,000. Following this exchange of emails, the property remained vacant for 18 months.

In September 2009 Gregory began storing some old Snopac equipment in the unoccupied warehouse. His sons, Dan and Ben, also stored a van and nets in the warehouse. And the tenants' father, Bruce, stored some personal furniture

---

[3] This court heard Leslie and Tammy's appeal, in which the principle issue was the value of the sisters' shares in the company. Snopac Products v. Spencer, 169 Wn. App. 1010 (2010) (unpublished).

there. The parties disagree on the exact amount of square footage occupied by Snopac during this time, but it is undisputed that it did not utilize the entire warehouse space.

Snopac paid $40,234.60 in property taxes, utilities and related expenses for the property during the time it used the warehouse as storage, which amounted to $2,117.61 per month. It recouped some of this expense by arranging for another company, Double E Foods, to use approximately 2,500 square feet of the property as storage space in return for $1,000 per month. Gregory and Glenda also allowed another company, Manson Construction Company, to park approximately 15 cars on a portion of the property during this time. Double E Foods and Manson used the property pursuant to written agreements, which Leslie and Tammy did not authorize.

On May 10, 2011, Gregory sent an email to Leslie and Tammy in which he reiterated his willingness to lease the property if the other tenants agreed to indemnify him against any damage claims arising from the unsafe condition of the warehouse. This email also advised Leslie and Tammy that Gregory and Glenda were soliciting offers to purchase the property "as is" and that upon receipt of such an offer, Leslie and Tammy would have the right to buy out Gregory and Glenda's ownership interests pursuant to the Agreement. The email further advised that ongoing attempts to lease the property might inhibit efforts to sell.

Two days later, Leslie and Tammy sent Gregory a letter entitled "60 Day Notice of Cure Breach of East Marginal Way Tenants in Common Co-Tenancy

Agreement," in which they claimed that Snopac was "leasing and subleasing the property" without their permission and in violation of the co-tenancy Agreement. CP at 1137. They alleged that Gregory had denied Leslie and Tammy's repeated requests to lease or sell the property in order to gain a personal benefit, i.e., a below market-rate lease and income-generating subleases for his company, Snopac, to the detriment of the other tenants. The letter demanded alleged back rent in the amount of $198,587.43 for Snopac's use of the property since September 2009.

In response to the notice, Snopac removed all of its equipment from the warehouse, but it did not pay the claimed damages. Snopac also ceased paying the property's taxes and utility expenses. It also appears undisputed that Double E Foods and Manson vacated the property within 60 days of the Notice of Cure,

Procedural History

Leslie and Tammy filed this action against Gregory and Glenda in September 2011, alleging breach of contract and unjust enrichment. They sought damages, attorney's fees, an apportionment of the alleged unjust enrichment conferred by unauthorized use of the property, an accounting of the revenues and expenditures under the co-tenancy Agreement, and specific performance under paragraph 12, which, in Leslie and Tammy's estimation, gave them the right to purchase Gregory and Glenda's ownership interest at the price dictated in subparagraph 12.3.

On December 1, 2011, while the case was pending, Manson made an offer to purchase the property. In response to this offer, the parties filed cross

motions for summary judgment on January 27, 2012. Leslie and Tammy moved for summary judgment on their specific performance claim. Gregory and Glenda moved for dismissal of Leslie and Tammy's claims for breach of contract and specific performance. They also requested specific performance of paragraph 13, which they argued authorized them to close the sale to Manson over Leslie and Tammy's objection. On February 24, 2012, the trial court entered an order dismissing Leslie and Tammy's claim for specific performance and authorizing Greg and Glenda to close the sale to Manson unless Leslie and Tammy "elect[ed] to match the offer & proceed[ed] to provide proof of actual ability to do so as one would be required to do in any other bona fide offer." CP at 505. Claims for damages between the parties were reserved for future proceedings.

Subsequently, Leslie and Tammy offered to purchase the property and the trial court heard evidence on whether they could match Manson's offer. The evidence showed that Manson had offered to purchase the property for $1 million cash plus indemnity for liability the tenants and their father Bruce might face for environmental cleanup associated with the property, including attorney's fees, up to $1,695,000. Manson also provided corporate documents and the declaration of its chief financial officer, which established that it had $26 million in cash or cash equivalents on hand to pay the purchase price without a financing contingency, as well as additional assets of $367 million and annual sales of $433 million to back up the indemnity.

Leslie and Tammy offered to match the $1 million purchase price and provide a similar indemnification agreement to Gregory and Glenda. In support of

No. 71036-2-I/8

their ability to fulfill this offer, Leslie and Tammy provided declarations and various exhibits, which established that Leslie and Tammy had acquired conditional financing from Key Bank in the form of home equity lines of credit totaling $600,000, pending appraisal, title, and insurance approval. Leslie also submitted evidence of $431,580.47 maintained in her own brokerage accounts and retirement accounts and those of Paul Neir,[4] whom she claimed was "willing and able" to pledge the funds. CP at 2292. Tammy submitted evidence of $311,554.45 maintained in her checking, brokerage, and retirement accounts. Leslie and Tammy also listed real estate assets, which included their personal residences and investment properties, minus outstanding home equity loans, valued at approximately $2.8 million.

On February 28, 2012 the trial court found that Leslie and Tammy had failed to match the purchase offer and ordered them to "cooperate in order to facilitate the closing" of the sale to Manson. CP at 508. On May 21, 2012 Leslie and Tammy filed a motion to vacate the order of February 28 on the basis that neither the real estate contract with Manson nor the court's order regarding sale reflected the market value of the property. They requested that the court order Gregory and Glenda to proffer a real estate contract

> that comport[ed] with the actual appraised value of the property,
> or that the Court in light of the evidence illegally not submitted
> by Plaintiffs' counsel allow the Plaintiffs to purchase the
> Defendants interests, at the price they have agreed to sell to
> Manson, so that Plaintiffs retain their property as they so desire;
> or, due to all of the new evidence presented, the facts not heard
> or weighed by the Court, and for the fact that there has been

---

[4] Mr. Neir's relationship to the parties is unclear from the record.

8

three subsequent amendments to the real-estate contract by
Manson and the Defendants which have not been seen by the
Court or the Plaintiffs, that the prior signed orders be stricken
and a new summary judgment hearing be noted. CP at 511-12.

The trial court denied this motion and entered an order authorizing Gregory and

Glenda to execute the closing documents. Pursuant to the trial court's order, the

sale to Manson closed on June 28, 2012.

Because the February 24 and 28, 2012, summary judgment orders did not

resolve issues related to claims for damages, Leslie and Tammy's breach of

contract and unjust enrichment claims proceeded. Greg and Glenda jointly

moved for summary judgment dismissal of the breach of contract claim insofar as

it arose from the sale of the property, arguing that, as a matter of law, the sale

was in line with paragraph 13 and the court's February 24 and 28 orders and did

not constitute a breach of contract. They also argued that Leslie and Tammy

failed to establish disputed facts regarding whether their other alleged acts or

failures to act constituted breach of contract or resulted in unjust enrichment.

On January 3, 2013, the trial court entered partial summary judgment,

decreeing that the sale of the property did not constitute a breach of contract. But

it denied summary judgment with respect to the remaining theories, finding

disputed facts as to "whether any duty to each other was breached." CP at 1522.

On January 4, 2013, Leslie and Tammy filed an amended complaint,

which added claims of bad faith, gross negligence, and breach of fiduciary duties

(against Gregory only) and quasi-fiduciary duties. Discovery proceeded for eight

months, during which time Leslie and Tammy stipulated to the dismissal of the

9

breach of quasi-fiduciary duty claim against both Gregory and Glenda and the unjust enrichment claim against Glenda.

At the close of discovery, Gregory and Glenda each moved for summary judgment on the remaining claims against them. The trial court granted both motions on September 13, 2013.

Leslie and Tammy appeal.

## DISCUSSION

### I.

Leslie and Tammy contend the trial court erred when it denied their claim for specific performance under paragraph 12, but granted specific performance to Gregory and Glenda under paragraph 13. They also contend that the trial court erred when it found that Leslie and Tammy failed to match Manson's purchase offer and authorized the sale to Manson over their objection.

Because the issues on appeal arise from summary judgment proceedings, our inquiry is the same as the trial court's, with questions of law reviewed de novo and the facts and all reasonable inferences from the facts viewed in the light most favorable to the nonmoving party. Christensen v. Grant Cnty. Hosp. Dist. No. 1, 152 Wn. 2d 299, 305, 96 P.3d 957 (2004). Summary judgment is proper only in the absence of a genuine issue of material fact. Id.; CR 56(c). Here, our review hinges on which provision, as a matter of law, rightly governed the disposition of the property in this case. See, Mayer v. Pierce Cnty. Med. Bureau, Inc., 80 Wn. App. 416, 420, 909 P.2d 1323 (1995) (explaining that this

court will not read an ambiguity into a contract that is otherwise clear and unambiguous and interpretation of an unambiguous contract is a matter of law).

Paragraph 12 authorizes the purchase of the ownership interest of any cotenant in "default or breach of any provision of [the] Agreement" by the remaining cotenants. CP at 187. The provision is triggered by the default, breach, or "transfer or attempted transfer not in accordance with the terms and provisions" of the Agreement by any cotenant. Id. Subparagraph 12.1 provides:

> In the event of any default or breach of any provision of this Agreement, or of any transfer or attempted transfer not in accordance with the terms and provisions hereof, by any Tenant (the "Defaulting Tenant"), any of the remaining Tenants may make written demand that such default or breach be cured or that such transfer be undone or that such proposed transfer be abandoned, as the case may be. If the Defaulting Tenant shall fail to fully comply with such demand within sixty (60) days after such demand is delivered to such Defaulting Tenant, then the remaining Tenants shall have the right, at their option exercisable at any time prior to full compliance with such demand and after the expiration of such sixty (60) day period, to purchase all (but no less portion) of the Defaulting Tenant's interests in the Tenancy.

CP at 187. Subparagraph 12.3 sets forth a formula for calculating the purchase price of a defaulting tenant's ownership interests based on a percentage of all payments made for the purchase and maintenance of the property. Thus, tenants purchasing an ownership interest pursuant to paragraph 12 have the benefit of acquiring it at a price unrelated to the fair market value.

Leslie and Tammy argue that paragraph 12 was triggered when Gregory and Glenda materially breached the Agreement in three ways: (1) giving permission to Snopac to occupy a portion of the property without a written lease and without Leslie and Tammy's consent; (2) allowing Double E Foods to lease a

11

portion of the warehouse for storage without Leslie and Tammy's consent; and (3) allowing Manson to lease 15 parking spaces without Leslie and Tammy's consent. They claim that, because Gregory and Glenda failed to timely remit payment of the damages claimed in their "60-Day Notice to Cure" letter, Leslie and Tammy acquired the right to purchase their ownership interests as set forth in subparagraph 12.3. They are mistaken.

At common law, each of the tenants had a non-exclusive right to use the entire property, so long as they did not prevent the other siblings from also using the property:

> Each tenant in common has a right to possess and enjoy the premises and may do so as if he or she is the sole owner. No tenant may bar another tenant in common from exercise of the same right or commit waste. United States v. Washington, 520 F.2d 676 (9th Cir. 1975), cert. denied, 423 U.S. 1086 (1976); De la Pole v. Lindley, 131 Wash. 354, 230 P. 144 (1924).

1 WASHINGTON REAL PROPERTY DESKBOOK, §3.2(2) (4th ed. 2009); see also, In re Foreclosure of Liens, 130 Wn.2d 142, 148, 922 P.2d 73 (1996) (citing Rouse v. Glascam Builders, Inc., 101 Wn.2d 127, 130, 677 P.2d 125 (1984)) ("The essential attribute of a tenancy in common is possession; each cotenant is the holder of an undivided interest in the whole of the property, with the right to possession and enjoyment of the whole property."). Under this rule, Gregory and Glenda were entitled to any use of the property not prohibited by the Agreement that did not oust their cotenants or result in waste. Because the Agreement did not prohibit granting others limited license to use the property, such use was presumptively permitted, subject to the prohibitions against ouster and waste.

Here, Snopac's use between September 2009 and May 2011 did not interfere in any way with Tammy or Leslie's intended use or commit waste. Thus, as a matter of law, this use was not a breach of contract that triggered the default provisions of paragraph 12. As to the alleged breaches due to the unauthorized leases to Double E Foods and Manson, it appears undisputed that both companies vacated the property within the 60 day deadline established by paragraph 12.

Leslie and Tammy also contend they were entitled to damages resulting from the occupancy of SnoPac, Double E Foods and Manson during 2009 – 2011, arguing that merely vacating the property within 60 days was insufficient to cure the breach. They claim they are entitled to damages in the amount of the market value of the space utilized by Sno-Pac, Double E Foods and Manson or, in the alternative, a fair share of the amounts paid by Double E Foods and Manson, arising from their occupancy. The claim is without merit. As discussed above, Snopac's occupancy was not a breach of the Agreement and, thus did not give rise to a claim for damages. As to the damages arising from the occupation by Double E Foods and Manson, it is apparent from the record that the sums received from them were used to offset amounts owing by Leslie and Tammy as their contributions to the tenants' shared tax and utility obligations.

Given that no factual dispute exists regarding the timely cure of the only breaches of contract alleged to have triggered the default provisions of paragraph 12, summary judgment denying specific performance of that provision was proper.

Leslie and Tammy also argue that the trial court improperly authorized the sale of property under paragraph 13 or, in the alternative, that they were improperly denied their right of first refusal to buy out Gregory and Glenda's interests in the property. Both arguments lack merit.

Paragraph 13 provides a method for sale of the property in the event of deadlock on an issue requiring agreement of tenants owning a majority of the total undivided interests. Under subparagraph 13.1, any tenant, acting individually or jointly with others, may present a bona fide offer to purchase the property in writing at any time. Such offer may be from a tenant or group of tenants or a third party. Subparagraph 13.2 provides that presentation of such an offer triggers a thirty day response period. At the close of the thirty days, and regardless of whether an agreement is reached, the purchase offer will be deemed accepted, with each tenant entitled to his or her fair share of the proceeds of sale. CP at 190. However, subparagraph 13.3 provides a tenant the right to buy out the remaining tenants' interests in preference over the outstanding offer so long as the tenant's offer is "equivalent in amount and method of payment" and "upon the same terms and conditions" as the proposed sale.[5] CP at 191-93.

Leslie and Tammy argue that the trial court erred when it refused to allow them to exercise their right under subparagraph 13.3 to purchase Gregory and Glenda's ownership interests. They contend that their offer was equivalent in an

_____

[5] The amount of an equivalent offer is determined after a proportional adjustment to exclude the share or shares of the opposing tenant or tenants. In this case, an equivalent offer amount would be $500,000 after excluding the shares owned by Leslie and Tammy.

amount and method of payment and upon the same terms and conditions as the proposed sale of the property to Manson. We disagree. Because Manson offered $1 million cash with no conditions, Leslie and Tammy had to make an unconditional offer of at least $500,000, payable within 30 days of the date on which Manson submitted its offer. The undisputed evidence showed they were unable to do so. Instead their offer consisted of purported financing from Key Bank in the amount of $600,000, $100,000 of which was to be used to pay off Tammy's existing mortgage and the rest put toward the purchase of Gregory and Glenda's interests in the property at the price offered them by Manson. But this financing was conditional and neither Leslie nor Tammy offered evidence that they had or would timely meet these conditions. Moreover, it is evident from their declarations that they intended to finance the purchase of the property with either the Key Bank loans or their personal assets, but not both. They each state: "If I do not choose to finance the purchase of Gregory and Glenda's interests in the property with the Key Bank loan, I have sufficient liquid or near-liquid assets available to purchase their interests." CP at 2292, 2339. Thus, they did not intend to fund the purchase with a combination of loan funds and personal assets should they fail to secure all of the financing.

Additionally, although Leslie and Tammy provided evidence of assets valued at significantly more than $500,000, given the 30 day time frame provided under paragraph 13, a substantial portion of these assets was unavailable to contribute to the purchase price because it was invested in real estate. The only liquid assets available to Leslie and Tammy to purchase the property were funds

15

held in brokerage, retirement, and checking accounts, which totaled $743,134.92. But this amount was contingent upon contribution by a third party, Paul Neir, of over $355,138.09. Although Leslie and Tammy offered bank records establishing that Neir's accounts held the amounts claimed, they presented no affidavit or other admissible evidence in support of Neir's willingness to pledge that money toward the purchase of the property. Because Leslie's statement in her declaration that he was "willing and able" to do so is inadmissible hearsay, it was properly not considered on summary judgment. ER 801, 802; Dunlap v. Wayne, 105 Wn.2d 529, 535, 716 P.2d 842 (1986). The admissible evidence on summary judgment established only that Leslie and Tammy had $387,996.83 in their combined accounts, which fell short of the $500,000 cash they needed to match Manson's offer.

Because there are no disputed facts regarding Leslie and Tammy's inability to timely match Manson's offer to purchase, Gregory and Glenda were entitled to summary judgment decreeing that Leslie and Tammy failed to match the offer and authorizing Gregory and Glenda to close the sale.[6]

II.

Leslie and Tammy also challenge the trial court's September 13, 2013 orders dismissing their breach of contract and various tort claims against Gregory

---

[6] Because Leslie and Tammy failed to match the cash portion of the purchase offer, we do not consider their claims that they matched the indemnity portion of the offer and that the promise to indemnify was illusory. Accordingly, we do not address the parties' cross-motions for additional evidence on review, which ask us to consider evidence not before the trial court regarding the purported value of the indemnity.

and Glenda, arguing that disputed facts precluded summary judgment as to each claim. We find their arguments without merit.

With respect to Leslie and Tammy's breach of contract claim against Gregory, the trial court concluded that summary judgment was proper given Leslie and Tammy's failure "to establish with a degree of certainty the amount of damages to which they might be entitled as a result of any alleged breach. . . ." CP at 2019. We agree.

During summary judgment proceedings, Leslie and Tammy asserted three bases for damages in support of their breach of contract claim against Gregory: (1) his refusal to fund repairs related to the 2001 Nisqually earthquake; (2) his refusal to fund general repairs and maintenance; and (3) lost profits, rents, or opportunities to lease or sell the property. None is sufficient to raise a fact issue as to damages.

Claims for damages under the first theory are barred by the six-year statute of limitations governing actions for enforcement of a contract because they were not initiated until over a decade after the claim accrued. RCW 4.16.040; 1000 Virginia, Ltd. Partnership v. Vertecs Corp., 158 Wn.2d 566, 575 (2006) (a claim arising out of contract accrues on breach).

Next, to the extent Leslie and Tammy have asserted losses related to Gregory's refusal to fund general repairs and maintenance, lost profits, rents, or opportunities to lease or sell the property, such losses are purely speculative and insufficient to raise a fact issue on summary judgment. See, ESCA Corp. v. KPMG Peat Marwick, 86 Wn. App. 628, 639, 939 P.2d 1228 (1997) "Although the

precise amount of damages need not be shown, damages must be supported by competent evidence in the record. To be competent, the evidence or proof of damages must be established by a reasonable basis and it must not subject the trier of fact to mere speculation or conjecture." Id. A party seeking lost profits damages must show that they would have earned the claimed profits, but for the defendant's breach. Tacoma Auto Mall, Inc. v. Nissan North America, Inc., 169 Wn. App. 111, 135, 279 P.3d 487 , review denied, 175 Wn.2d 1024, 291 P.3d 253 (2012), (citing Larsen v. Walton Plywood Co., 65 Wn.2d 1, 15, 390 P.2d 677, 396 P.2d 879 (1964)); see also, Spradlin Rock Products, Inc. v. Public Utility Dist. No. 1 of Grays Harbor County, 164 Wn. App. 641, 645, 266 P.3d 229 (2011) (finding sufficient evidence of lost profits damages to withstand summary judgment where the plaintiff established a particular construction project foregone as a result of defendant's delayed performance and a likelihood to be awarded the project based on an ongoing business relationship with the sponsor of the project); Golf Landscaping Inc. v. Century Construction Co., 39 Wn. App. 895, 696 P.2d 590 (1984) (finding plaintiff's alleged lost profits damages were purely speculative where the claim was based entirely on a list of projects appearing in a journal that it could have hypothetically bid on during the delay caused by defendant's breach and testimony that it would normally bid on one job per week with a twenty-five percent success rate).

In this case, Leslie and Tammy's opposition to Gregory's motion for summary judgment cited no evidence of repair or maintenance costs incurred by them or particular lost profits, rents, or opportunities. Instead, their opposition

brief was comprised entirely of argument as to why their claim for repair costs related to the Nisqually earthquake was not time barred and evidence of Gregory's alleged breach of contract and tortious acts. They cited no provision in the Agreement which entitled them to repair costs or expenses that have yet to be incurred and a review of the contract reveals no such provision.[7] Nor do they argue that Gregory or Glenda prohibited them from undertaking the repairs themselves and thereafter seeking reimbursement from their cotenants pursuant to the Agreement.

Leslie and Tammy also contend that they sustained a loss equal to their share of fair market rent for the 53 months between Snopac's initial departure in 2008 and the ultimate sale of the property. But, because the co-tenancy agreement did not require any cotenant to agree to any lease or require the managing tenant to maintain Snopac or any other lessee in the property, Leslie and Tammy had no contractual right to such amounts.

They also claim that they are entitled to the fair market value of the space utilized by Double E Foods and Manson or, in the alternative, a fair share of the amounts paid by Double E Foods and Manson during their occupancy. But, it is undisputed that the monies paid by Manson and Double E Foods offset the shared obligation of the co-tenants to pay property taxes and utility costs during their occupancy; thus, Leslie and Tammy have already received a fair share of the amounts paid and cannot show damages under this theory.

---

[7] By contrast, the Agreement expressly requires tenants to reimburse the tenancy or a cotenant for expenditures and costs actually incurred on the behalf of the tenancy.

19

On appeal Leslie and Tammy reassert claims for damages arising from Gregory's alleged failure as managing tenant to obtain a written lease agreement from Snopac and the tenancy's alleged losses resulting from the sale of the property at below market value.[8] Regardless of whether these claims raise a factual dispute as to damages, they do not create an issue of fact regarding whether Gregory breached the Agreement, which does not oblige the managing tenant to secure a written lease agreement from Snopac or any other lessee. Nor does it require that an offer tendered and accepted pursuant to paragraph 13, such as the purchase offer from Manson, represent fair market value of the property.

We conclude that Leslie and Tammy's breach of contract claim against Gregory was properly dismissed based on their failure to raise a fact question as to each essential element.

We also conclude that Glenda was entitled to summary judgment on the breach of contract claim against her. Leslie and Tammy claimed that Glenda's alleged refusal to agree re-let the property or fund repairs related to the Nisqually earthquake constituted a breach of the Agreement, which resulted in damages. Based on the plain language of the Agreement, which implicitly granted each cotenant the right not to agree and expressly contemplated deadlock among the cotenants on such issues as leasing the property, Glenda's mere refusal to agree

---

[8] The claims were withdrawn previously in response to the trial court's January 3, 2013 order dismissing certain damages claims unrelated to: (1) lost rents from 2008-2012; (2) damages from allowing Gregory as a cotenant to store Snopac's equipment between September 2009 and May 2011; and (3) damages related to allowing Manson to park 15 employee cars on the property.

to lease the property was, as a matter of law, not a breach of contract. See, Mayer, 80 Wn. App. at 420. Because Leslie and Tammy's remaining claims for losses related to the Nisqually earthquake are time barred and their claimed losses resulting from the failure to fund general repairs and maintenance are purely speculative, they fail to establish any actionable breach of contract on Glenda's part. Accordingly, she was entitled to judgment on this claim.

Leslie and Tammy also failed to raise a fact question on each of their tort claims. As a matter of law, their bad faith and gross negligence claims against Gregory and Glenda are barred under the independent duty doctrine, which generally bars recovery for tortious misconduct where a contractual relationship exists and the losses are purely economic losses. Eastwood v. Horse Harbor Found., Inc., 170 Wn.2d 380, 393-95, 241 P.3d 1256 (2010). Although, we recognize an exception to this rule where a defendant's alleged breach of contract implicates a tort duty that arises independently of the terms of the contract, (see, e.g., Id. at 393-94), the exception is inapplicable here because Leslie and Tammy's bad faith and gross negligence claims are based solely on Gregory and Glenda's alleged breach of an express contractual provision (paragraph 17) and the "'duty of good faith and fair dealing ... implied in every contract.'" CP at 1489 (quoting 6A WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL (WPI) 302.11 (6th ed. 2012).

Unlike their bad faith and gross negligence claims, Leslie and Tammy's breach of fiduciary duty claim has a firm basis in tort law and, as such, is not precluded under the independent duty doctrine. See, Micro Enhancement Intern.,

21

Inc., v. Coopers & Lybrand, LLP, 110 Wn. App. 412, 433-34, 40 P.3d 1206 (2002). Nevertheless, Gregory was entitled to judgment on this claim because Leslie and Tammy failed to establish they incurred any damages as a result of the alleged breach. See, Id. (explaining that in a breach of fiduciary duty claim it is the plaintiff's burden to establish: (1) existence of a duty owed, (2) breach of that duty, (3) resulting damage, and (4) that the claimed breach proximately caused the injury).

In support of their breach of fiduciary duty claim, Leslie and Tammy asserted damages arising from: (1) Gregory's failure to secure a written lease from Snopac and attendant losses resulting from Snopac's departure without notice in February 2008; (2) his failure to require Snopac to maintain insurance on the property, resulting in the tenancy bearing the cost of repairing damage from the 2001 Nisqually earthquake; (3) his failure to lease and refusal to agree to lease to a new tenant after Snopac's initial departure in 2008, which resulted in lost profits, rents and opportunities; and (4) his entry into lease agreements with Double E Foods and Manson without proper authorization. To the extent their breach of fiduciary duty claim is based on the first three theories, it is barred under the statute of limitations because it was not filed until January 4, 2013, more than three years after the claim accrued. RCW 4.16.080(2); Hudson v. Condon, 101 Wn. App. 866, 872-73, 6 P.3d 615 (2000) (holding that a breach of fiduciary duty claim is subject to the three-year tort statute of limitations). And, as discussed previously, Leslie and Tammy cannot establish damages resulting from the leases to Double E Foods and Manson because they undisputedly

22

received their fair share of the monies collected from those companies. Given Leslie and Tammy's failure to establish damages on their breach of fiduciary duty claim, Gregory was entitled to judgment.

*Affirmed.*

WE CONCUR:

Spearman, C.J.

Lau, J.

Becker, J.